720 A.2d 408 (1998)
316 N.J. Super. 351
CPC INTERNATIONAL, INC. and Brodson Properties, Inc., Plaintiffs-Appellants,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY and Allstate Insurance Company, as Successors-in-Interest to Northbrook Excess & Surplus Insurance Company, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 28, 1998.
Decided November 19, 1998.
*410 David L. Harris, Roseland, for plaintiffs-appellants (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Mr. Harris, of counsel; Stephen R. Buckingham and Alex Moreau, on the brief).
John M. Bowens, Bedminster, for defendant-respondent Hartford Accident & Indemnity Co. (Purcell, Ries, Shannon, Mulcahy & O`Neill, attorneys; Mr. Bowens and Donna M. Stephan-Nolan, on the joint brief).
Daniel A. Bartoldus, for defendant-respondent Allstate Insurance Co. (Rivkin, Radler & Kremer and Manta & Welge, attorneys; Mr. Bartoldus, Joshua N. Krellen, Uniondale, NY, Stephen W. Miller, Iselin and E. Blaine Stanley, Philadelphia, PA, on the joint brief).
Insurance Environmental Litigation Association, submitted an amicus curiae brief (Hughes & Hendrix, attorneys; Gerald A. Hughes, West Trenton, on the brief).
Before Judges BAIME, CONLEY and KIMMELMAN.
*409 The opinion of the court was delivered by BAIME, P.J.A.D.
This case concerns insurance coverage for environmental pollution. CPC International, Inc. (CPC) and its subsidiary Brodson Properties[1] (Brodson) appeal from a summary judgment dismissing their claims against Allstate Insurance Company[2] (Allstate) and *411 Hartford Accident & Indemnity Company (Hartford) for extensive environmental remediation costs. At issue is whether the Law Division erred by finding as a matter of law that CPC intended and expected to cause the environmental damage that was the subject of its claim. An ancillary question is whether the Law Division was correct in its conclusion that coverage was barred by the doctrine of known loss. Our examination of the record discloses genuine issues of material fact that should not have been resolved by summary judgment.

I.
In 1989, CPC filed a complaint for a declaratory judgment seeking indemnification from forty-three primary and excess insurers for substantial environmental remediation costs incurred at six chemical manufacturing sites formerly owned by its subsidiaries. In a case management order, the Law Division stayed all proceedings relating to three of the sites. The proceedings that followed pertained solely to three chemical and bulk pharmaceutical plants that had been operated by CPC's wholly owned subsidiary, S.B. Penick Company (Penick). CPC settled its claims against all of the insurers except Allstate and Hartford. It contended below, and continues to urge here, that the two remaining insurers are liable for indemnification under a series of primary, excess and umbrella policies issued between 1964 and 1986.
The parties filed cross-motions for summary judgment. On April 15, 1996, the Law Division issued an extensive letter opinion granting the insurers' motions and denying that of CPC. The court determined that CPC intended to harm the soil and groundwater at the Penick sites and was thus barred from coverage under the occurrence-based language contained in the insurance policies. The court found that CPC was aware of the pollution damage before entering the relevant insuring agreements and was precluded from recovering under the known loss doctrine.
Shortly after entry of the summary judgment order, CPC moved to dismiss the remaining counts dealing with the other three sites. Over the insurers' objections, the Law Division granted CPC's motion and entered an order of dismissal without prejudice. Allstate and Hartford appealed from the voluntary dismissal order. CPC then filed a cross-appeal from the order granting the insurers' motion for summary judgment. Allstate and Hartford subsequently withdrew their appeals. The cross-appeal remains.
The record can be fairly characterized as voluminous, consisting of thousands of pages of deposition testimony and reams of technical, scientific data. What emerges, however, is less than a complete picture. In their zeal to depict their clients in the most favorable light, counsel presented to the Law Division, and now to us, excerpts from depositions and technical memoranda devoid of contextual material. The result is a highly fragmented record from which it is exceedingly difficult to derive accurate and reliable conclusions.
In its lengthy opinion, the Law Division listed more than eighty findings of fact from which it concluded as a matter of law that Penick expected or intended to cause the injury to the soil and groundwater upon which CPC's claims for coverage are based. We will discuss these findings later in our opinion. Suffice it to say, Penick is portrayed in the Law Division's opinion as a profit-hungry corporate bandit that conducted itself in a manner that was wholly unmindful of the environmental degradation its acts were nearly certain to cause. Perhaps, that portrait is accurate. Indeed, our examination of the record discloses excerpts from which it appears that many of the court's findings are well grounded.
We hasten to add, however, that the Law Division's most critical findings were based on the deposition testimony of three disgruntled, former CPC employees whose credibility was open to question. One of the employees was apparently convicted of having engaged in commercial bribery and was discharged by CPC, thus losing his pension. Another sustained severe financial losses when his bid to purchase one of CPC's businesses was rejected by a corporate officer whom the witness admitted he "hated." The third had left CPC to form a consulting company to testify in favor of insurers in *412 environmental pollution cases and was paid by Hartford to testify in this case. The testimony presented by these witnesses may well be accurate, but we are reluctant to deprive a trier of fact of the opportunity to pass upon their credibility. Because of the fragmentary record and the diverse ways in which the evidence may be interpreted, we summarize only the most salient features of the case.

A. The Lyndhurst Site

Penick acquired the Lyndhurst property in 1928. The site consists of approximately seventeen acres. Beginning in 1941, the plant produced various chemical products, including pharmaceutical formulations, specialty organic and botanical preparations, and pesticides. As part of its operations, Penick stored solvents, synthetic chemicals and raw botanical feed stocks in aboveground tanks, underground tanks and fifty-five gallon drums.
Conflicting evidence was presented concerning the testing of underground storage tanks for leaks and corrosion. Charles Butera, a Penick engineer, testified that Penick did not test tanks in Lyndhurst until the enactment of a municipal ordinance requiring inspections every five years. However, Edgar Nowak, the supervisor of construction and maintenance at the Lyndhurst site, related that tanks were inspected annually beginning in 1959 and that "suspect" tanks were pressure tested in order to determine their integrity. Penick employees knew that when a solvent such as toluene is mixed with water it has a corrosive effect, but most of Penick's tanks were not lined with a protective coating.
Tank 24, an underground tank used to store toluene, was installed in 1970. In May 1980, a Penick employee reported to Butera that a toluene spill from the "corroding" tank had occurred due to "head pressure." In reporting the leak to the Department of Environmental Protection (DEP), Butera represented that the amount of the leaked toluene was unknown, "but a hole at the tank end where [the] leakage occurred yielded no toluol odors, even when filled with water from recent rains." In his letter to the DEP,
Butera stated that it could be "assumed ... the small amount of toluol, which leaked out, [ultimately] evaporated and dissipated into the atmosphere in dilute amounts." In his deposition, Butera testified that he did not know how the spill was detected. However, he suggested that "varying numbers on the monthly audit" of the contents of the tank perhaps indicated that an inordinate amount of the chemical was lost, thus generating a suspicion that a spill had occurred or that the tank leaked. Thakor Tailor, an engineer formerly employed by Penick in its central engineering department, testified that tank 24 should not have been used for storing recovered toluene. According to Tailor, the tank was designed and manufactured for the storage of "pure toluol" and not for the storage of "recovered toluol" which contained corrosive contaminants. Tailor stressed that a leak in tank 24 could reasonably be expected because of the impurities and contaminants in the recovered toluol. Tailor also testified that an audit of the tank contents should have revealed a large loss of toluene which could only be the result of a leak of great magnitude.
We digress to note that Tailor's testimony pertaining to the toluene leak at the Lyndhurst plant and Penick's record respecting other leaks and spillages played an important part in the Law Division's findings. However, our reading of Tailor's deposition indicates that his testimony was brimming with hostility toward CPC. Apparently, Tailor had been convicted of commercial bribery, had lost his pension and was liable to CPC for damages under a civil judgment. We have underscored the word "apparently" because Tailor refused to answer questions concerning the circumstances surrounding his discharge from CPC.
The testimony of James Murtha, Penick's former director of regulatory and quality assurance affairs, also featured prominently in the Law Division's findings. Murtha, too, was extremely hostile to CPC, having suffered substantial financial losses in his failed attempt to purchase one of the company's extraction businesses and having been discharged from employment. In any event, Murtha testified that CPC should have discovered *413 the leak in tank 24 long before it did and should have taken more aggressive measures to ameliorate the resulting environmental harm. Although the exact chronology of events is not clear, Murtha testified that the paved parking lot adjacent to the tank degraded substantially and the trees nearby had lost their leaves, suggesting that contaminants were leaking at an alarming rate. Murtha's investigation revealed that employees in a building near the tank had turned off the heater during the winter months because toluene odors in the basement generated fears of an explosion. Test drillings by Murtha and his colleagues indicated that between 50,000 to 100,000 gallons of toluene had leaked from the tank. Based upon the flow rate derived from the tank's capacity, Murtha estimated that the leak might have begun long before its discovery. Subsequent investigation of the inventories of the tank confirmed sharp discrepancies. Murtha testified that the inventories were not effectively monitored.
Edward Pietrosky, Jr., Penick's former manager of regulatory compliance, testified that he harbored suspicions "there was something peculiar with [the] system for about a year and a half" before the leak was discovered. Pietrosky noted that the parking lot adjacent to the tank had deteriorated, indicating that there was some leakage or spillage. Initially, Pietrosky suspected that the damage was caused by occasional spills from "overfilling" the tank. However, the severity of the damage ultimately led Pietrosky to suspect that there were other reasons for the deterioration of the pavement.
Pietrosky derided Penick's environmental record. According to Pietrosky, Penick was "deathly afraid" of "regulatory oversight" and deliberately "low ball[ed]" environmental problems to keep the DEP at bay. Pietrosky charged that Butera purposely mischaracterized the discharge as minor in his report to the DEP in order to avoid "rapid" regulatory response.
It is undisputed that tank 24 was taken out of service shortly after the leak from a hole was discovered. Extensive environmental studies indicated that a toluene plume had infiltrated the groundwater and that the toluene plume originated from a discrete leakage point in tank 24. In February 1982, Penick consultants proposed remedial measures to control and abate the toluene contamination, including the construction of an interceptor trench system. Penick later authorized construction of the system to prevent off-site migration of the toluene plume.
In 1987, benzene plumes were discovered in the northern and southern portions of the Lyndhurst site. The record is largely uninformative with respect to the cause of the contamination. Yet, it is clear that benzene was used in a botanical extraction process. In 1977, a leak in tank 97 was discovered and the tank was immediately taken out of service. CPC attributed the benzene plume to a leak that occurred prior to abandonment of tank 97.
In their documentary submissions, the insurers presented extensive evidence relating to the discharge of other pollutants at the Lyndhurst plant. For example, Murtha and Tailor testified that Penick discharged most of the production department wastes in an unlined drainage ditch leading to the plant's storm sewer system. They asserted that the pesticides department "dumped" one hundred gallons of process and general use wastes directly into the ditch on a daily basis, and that aqueous wastes from the solvent recovery plant were discharged directly into the sanitary sewer lines. According to their testimony, Penick routinely washed chemical spills and leaks into the sewers. However, much of this evidence was contested. Penick presented conflicting evidence indicating that shallow trenches inside and outside of the buildings were designed to be used as an emergency measure "[i]n the event of fire, tank rupture or leakage." Moreover, Penick presented evidence that only "trace solvents [were] carried with the water into the sewer" as part of a "thin layer of emulsion," which was permitted under the environmental regulations then in force.
The insurers presented additional evidence relating to Penick's practice of storing solvents in leaking, collapsed and broken drums. However, no evidence was presented indicating that these contaminants ultimately infiltrated groundwater at the site.

*414 B. The Newark Site

Penick acquired the Newark site from New York Chemical Works in 1951. The property is comprised of slightly less than ten acres. The plant produced various pharmaceuticals until 1988. Underground tanks were used to store butanol, trichloroethylene (TCE) and toluene. Because "recovered chemicals" were stored in these tanks, Tailor observed that there was "a possibility" impurities and contaminants would, over time, "build up and corrode [the] tanks." According to Tailor, the tanks were not coated, although it was known that a lining would retard the rate of corrosion and reduce the possibility of leakage. Moreover, the tanks were not tested on a periodic basis.
Inventory records reflected large losses of TCE. These dramatic losses were inconsistent with the design of the closed system in which the chemical was used in production, recovered, and then returned to the storage tank for reuse. Pietrosky testified that "[t]he control of TCE was horrendous." Although Pietrosky did not specifically say that the narcotics production unit should have inferred that losses were due to a leaking tank rather than a problem with the production or reclamation process, he questioned why no one "inquired" into the reason for the loss of TCE.
Murtha testified that there was other evidence suggesting a leak in the tank. According to his testimony, lower level employees devised a method "for getting rid of water in the trichloroethylene ." When Murtha learned of the employees' "routine," he questioned why there was so much water in the TCE. Murtha suspected that groundwater was "seeping" into the tank and that the Penick employees were "cleaning it up" rather than reporting the condition. Murtha ordered that the tank be removed. By that time, however, the TCE plume had migrated into the groundwater. Murtha estimated that the tank had been leaking TCE for approximately three years prior to the tank's removal.
Subsequent environmental studies indicated that other underground storage tanks containing butanol and toluene had also developed leaks. However, the exact chronology of events is unclear. Samplings performed over two years after removal of these tanks disclosed significant amounts of TCE, toluene and butanol in the groundwater.
The insurer presented additional evidence pertaining to contaminants leaking into the soil from sewer pipes and fifty-gallon drums. A 1975 sewer project revealed substantial leaks and cracks in the plant's underground pipes. Metal drums containing waste chemicals were stored outside on the ground and on wooden pallets and were fully "exposed to the elements." No evidence presented, however, indicated that these conditions caused the contamination of the groundwater or soil which was the subject of CPC's claim.

C. The Montville Site

Penick acquired the Montville site in 1945. The property is comprised of twenty-seven acres and is traversed by a meandering stream known as the Crooked Brook. From 1945 until 1978, Penick manufactured pharmaceutical products at the site through the extraction, distillation and chemical synthesis of raw botanical materials. Between 1952 and 1970, Penick disposed of "wet process residues" in a clay-lined lagoon. From 1959 to 1974, Penick buried drums containing chemical waste on site. In 1979, Penick attempted to sell the property. A groundwater study indicated that soil and groundwater contamination existed in four distinct areas. The report concluded that the two primary sources of soil and groundwater contamination were the lagoon and drum burial areas. We thus focus upon Penick's activities dealing with the lagoon and the burial of drums containing chemical waste.
As we noted, from 1952 until 1970, all of Penick's liquid chemical waste was discharged into a clay-lined lagoon. These wastes include acids, solvents, metals, carbonate washes, salicylate products, guaiacol and chromium salts. In 1955, the Passaic Valley Water Commission (Commission) complained that pollution was emanating from the lagoon and was affecting the Passaic Valley Watershed. Although the Commission did not have the authority to compel elimination of the lagoon, it demanded swift action. As internal memoranda disclose, *415 Penick took the complaint seriously and considered methods designed to ameliorate or eliminate the problem. However, on August 17, 1959, the Commission brought a civil action which resulted in a Chancery Division order enjoining Penick from discharging pollutants into the Crooked Brook. The order permitted Penick to continue using the lagoon on condition that aqueous wastes be maintained at a level above the clay strata and that seepage of pollutants be eliminated.
Penick continued to discharge chemical waste into the lagoon. On August 19, 1968, the Department of Health obtained a Chancery Division judgment enjoining Penick from "allowing or permitting the discharge of any polluting matter from its manufacturing plant" into the Crooked Brook, its tributaries or their banks. The judgment allowed Penick to continue to use the lagoon but only up to "a level which [would] obviate the threat of overflow [or] seepage" and only with Department approval.
At some time in 1968 or 1969, Ralph Schmidt, a Penick employee, noticed stains in the soil "coming out of the embankment of the brook," which was approximately seventy-five to one hundred feet from the lagoon. According to Schmidt, the stains had "the characteristic dark color of ... guaiacol material" which he knew was discharged from the manufacturing plant to the lagoon. Schmidt suspected that pollutants were "seeping" from the lagoon into the Crooked Brook, not by groundwater, but by hydraulic pressure. He reported his suspicions to his superiors. There followed a flurry of internal memoranda proposing solutions to the problem. Surprisingly, the record does not contain information concerning the date the lagoon was closed. However, it is relatively clear that Penick eliminated the lagoon some time prior to 1970, shortly after Schmidt's discovery of the stained soil. Nevertheless, the "tar" materials at the bottom of the lagoon were never removed. Schmidt explained that removing all of the tar would have been "a physical impossibility." It was thus decided that the tar would be left in place with the expectation that over several years percolation would "flush out" the substances of concern.
Penick stopped burying drums at the same time it eliminated the lagoon. Wastes that were previously placed in drums were, instead, transported to a submerged incineration unit. However, that did not completely resolve the problem. On June 18, 1974, the Montville Board of Health inspected the plant and found empty and partially filled drums in the proximity of the Crooked Brook. In its report, the Board related that "residue and waste from the barrels were seeping into tributaries" of the stream. The Board indicated that the drums "ha[d] been buried in a make-shift landfill" prohibited by Township ordinance. On July 1, 1974, Penick wrote to the Board acknowledging the problem and promising to correct it. Internal Penick memoranda indicated that "all of the drums were removed promptly." However, in 1977, Penick closed its operations in Montville, and a consultant discovered additional drums in the storage area. The consultant found that "there were several pockets of drums that still remained" and that they "were contributing as a source of contaminants to the general groundwater profile." Approximately 120 drums of "chemical material" were subsequently removed.

II.
Certain prefatory comments are in order respecting the procedural context in which we consider the issues presented. An aggrieved party is permitted to appeal to the Appellate Division "as of right ... from final judgments of the Superior court trial divisions...." R. 2:2-3(a)(1). To be considered a final judgment appealable as of right, the order must generally dispose of all issues as to all parties. See Hudson v. Hudson, 36 N.J. 549, 553, 178 A.2d 202 (1962); Scalza v. Shop Rite Supermarkets, Inc., 304 N.J.Super. 636, 638, 701 A.2d 764 (App.Div.1997); Stigliano v. St. Rose High Sch., 198 N.J.Super. 520, 523 n. 1, 487 A.2d 1260 (App.Div. 1984); Pressler, Current N.J. Court Rules, comment 2 to R. 2:2-3 (1999). "`Piecemeal reviews ordinarily are anathema to our practice.' " Hallowell v. American Honda Motor Co., 297 N.J.Super. 314, 318, 688 A.2d 110 (App.Div.1997) (quoting Frantzen v. Howard, 132 N.J.Super. 226, 227-28, 333 A.2d 289 *416 (App.Div.1975)). The interruption of litigation at the trial level by the taking of an unsanctioned appeal disrupts the entire process and is wasteful of judicial resources.
Against this backdrop, we note that the Law Division's summary judgment order in this appeal would have been interlocutory but for its dismissal of CPC's claims regarding remediation costs of the other three sites. The dismissal of these claims was "without prejudice." We harbor the distinct impression that they will be reinstated following our opinion in this case, and that the dismissal without prejudice constituted an artifice to foist jurisdiction upon this court.
The questions presented by this appeal are substantial and require prompt disposition. We add, however, that the voluntary dismissal rule, R. 4:37-1(b), should not be used to transmogrify an interlocutory order into a final judgment for the purpose of affording an opportunity to appeal as of right.

III.
We deal with insurance policies issued between 1964 and 1986. The language contained in those policies differs. For example, the earlier Hartford policies provided coverage for bodily injury and property damage "caused by [an] accident." Undated endorsements extended coverage to an "occurrence," which was defined in terms of "an event" or "a continuous or repeated exposure" that "unintentionally" causes "bodily injury, sickness or disease" or "destruction of property." Later Hartford policies defined "occurrence" as "an accident including injurious exposure to conditions," which results "in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policies issued by Northbrook, Allstate's predecessor, follow essentially the same progression. However phrased, each policy encompasses the concept of fortuity by requiring that an event, in order to be insurable, must in some way be accidental or uncertain.
Our Supreme Court has interpreted similar "occurrence-based" policy language in a variety of contexts. In Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 607 A.2d 1255 (1992), the insured was sued on the basis of statements she made at a public meeting questioning the competency of her child's teacher, the claimant in the underlying litigation. The claimant alleged that she suffered bodily injury including extreme emotional distress. Although the insured's statements were deliberate, she asserted that any resulting harm to the claimant was unintentional and was thus covered by the occurrence-based language contained in her policy. The Court held that the accidental nature of an occurrence is determined by analyzing whether the insured subjectively intended or expected to cause an injury. Id. at 183, 607 A.2d 1255. That interpretation was said to "prevent[ ] those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing." Ibid. The Court emphasized that "[e]ven when the actions in question seem foolhardy and reckless," the appropriate inquiry focuses upon the insured's "subjective intent to cause injury." Id. at 184, 607 A.2d 1255. The Court recognized an exception to the general rule where the insured's misconduct is palpable and deplorable. As phrased by the Court, "[w]hen the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the insured's subjective intent to injure." Ibid. That objective approach was said to focus "on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's state of mind." Ibid.
In SL Indus., Inc. v. American Motorists Ins. Co., 128 N.J. 188, 607 A.2d 1266 (1992), the Court confronted the related question whether any intent to injure will render the resulting harm intentional or whether the wrongdoer must intend the specific injury that results. The Court adopted a "middle ground" between the two approaches, which it summarized as follows:
Assuming the wrongdoer subjectively intends or expects some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the *417 injury was `accidental' and coverage will be provided.
Id. at 212, 607 A.2d 1266; see also Prudential Property & Cas. Ins. Co. v. Karlinski, 251 N.J.Super. 457, 463-64, 598 A.2d 918 (App.Div.1991).
In Morton Int'l Inc. v. General Acc. Ins. Co. of Am., 134 N.J. 1, 629 A.2d 831 (1993), cert. denied sub nom. Insurance Co. of N. Am. v. Morton Int'l, Inc., 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), the Court addressed questions relating to occurrence-based language contained in a series of comprehensive general liability policies in the context of environmental pollution. The Court began its analysis by "acknowledg[ing] the impracticality of adherence to the general rule that `we will look to the insured's subjective intent to determine intent to injure.'" Id. at 85, 629 A.2d 831 (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. at 185, 607 A.2d 1255). The Court observed that "[a]lthough insureds may concede that pollutants... had been intentionally discharged, those insureds are virtually certain to insist that the resultant harm was unintended and unexpected." Ibid. Thus, "[a]bsent `smoking gun' testimony from a disgruntled employee, proof of subjective intent to cause environmental harm will rarely be available in coverage litigation." Id. at 85-86, 629 A.2d 831.
On the other hand, the Court recognized that "insureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges." Id. at 86, 629 A.2d 831. The Court reasoned, therefore, that "[a] general rule in environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified." Ibid. Instead, the Court held that "in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, `exceptional circumstances [exist] that objectively establish the insured's intent to injure.'" Ibid. (alteration in original) (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. at 185, 607 A.2d 1255). These
circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
Id. at 86-87, 629 A.2d 831. The Court then detailed the extensive evidence establishing that the insured's predecessors intended or expected the resulting environmental injury and concluded that summary judgment was properly awarded to the insurers. Id. at 87-88, 629 A.2d 831.
The Court most recently revisited this subject in Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 712 A.2d 1116 (1998). Among the issues presented in that case was whether the insured or the insurer bears the burden of proving the accidental nature of the event resulting in environmental pollution under the standards adopted previously in Morton. Id. at 317-18, 712 A.2d 1116. In interpreting New Jersey law, the federal courts had placed the burden on the insured to prove that it did not expect or intend to cause the property damage at issue. See, e.g., Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d 976, 983 n. 6 (3d Cir.), cert. denied sub nom. Jackson v. Chemical Leaman Tank Lines, Inc., ___ U.S. ___, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996); Pittston Co. v. Allianz Ins. Co., 905 F.Supp. 1279, 1300 (D.N.J.1995), rev'd in part on other grounds, 124 F.3d 508 (3d Cir.1997). However, our Supreme Court disagreed with this interpretation, holding that "an insurer must bear the burden of proving that an insured intended or expected environmental damage." Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. at 330, 712 A.2d 1116. In reaching this conclusion, the Court reasoned that it would be "highly impractical" to require the insured to prove a negative factthat it did not intend or expect environmental damage. Ibid. The Court was also persuaded by the fact that "it is the insurer who has an interest in, and is better positioned for, eliciting facts on the basis of which a trier of fact can conclude that the *418 insured expected or intended environmental contamination." Id. at 331, 712 A.2d 1116.
It is within this analytical framework that we examine the issues raised in this case. We reverse the summary judgment as it was based on CPC's failure to establish an "occurrence" because (1) the Law Division's inquiry was not focused upon whether the insured expected or intended to cause environmental damage qualitatively comparable with that which is the subject of the remediation claim, (2) the court incorrectly placed the burden of proof on the insured rather than the insurer, and (3) the court decided factual questions although the evidence was in dispute.

A. The Improbability of Harm

CPC argues that the Law Division incorrectly applied the "exceptional circumstances" test adopted in Morton. In advancing this contention, CPC points to the Law Division's statement that the Supreme Court "abandoned" the traditional focus upon an insured's subjective intent to injure in favor of an objective test. From this isolated statement, CPC asserts that the Law Division misread the Morton decision.
We agree that the Law Division perhaps exaggerated the impact of Morton in applying occurrence-based policy language in environmental pollution cases. Morton's finding of an insured's subjective intent to cause property damage from egregious circumstances does not hinge on whether the insured should have expected or intended to cause injury. Such a test would be akin to a negligence standard. Pittston Co. v. Allianz Ins. Co., 905 F.Supp. at 1301. If negligent acts did not fall within the definition of a covered occurrence, there would be no point in purchasing comprehensive general liability insurance. Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d at 985. While Morton pragmatically admonishes courts not to ignore reality when exceptional circumstances establish the insured's subjective intent to injure, we do not read the Supreme Court's opinion as creating an objective negligence-type standard for determining whether an event constitutes an "occurrence." We hasten to add, however, that CPC has taken the Law Division's statement out of context and imbued it with an importance that is belied by the remainder of the court's opinion.
CPC's argument, however, raises another point of greater consequence. In its brief, CPC emphasizes that its claim for indemnification pertained to groundwater and soil contamination. Although ambiguously phrased, CPC contends that the intent to injure test must be measured by the environmental damage for which indemnification is sought. Extrapolating from the principles set forth in S.L. Indus., Inc. v. American Motorists Ins. Co., 128 N.J. 188, 607 A.2d 1266, CPC notes that evidence may be sufficient to warrant a finding that an insured intended to cause some minor injury but be insufficient to justify a conclusion that it intended to cause severe environmental damage.
This point was addressed by the Third Circuit in Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d 976. There, the Court observed that "[a]n insured who intentionally discharges a known pollutant generally intends `some sort of harm,' however de minimis, and the harm that actually results is usually a probable result of the discharge." Id. at 987. It was noted, however, that "[i]n the environmental pollution context, the insured's appreciation of the magnitude and nature of harm likely to be caused by a discharge is relevant in determining whether insurance coverage should be precluded." Id. at 988. The Court emphasized, "[i]f an insured does not understand the causal connection between the discharge of a pollutant and the property damage that results, deterrence is not served by precluding insurance coverage." Ibid. The Court concluded that the inquiry should focus upon the insured's intent or expectation to cause environmental harm of a particular sort. Ibid. Where the insured intended or expected such harm, coverage was said to be precluded. Ibid. The Court stressed, however, that "an insured's intent to cause environmental harm of one sort will not preclude coverage for other kinds of unintended or unexpected environmental harm." Ibid. We agree with this portion of the Third Circuit's analysis.
*419 In determining whether occurrence-based policy language bars coverage, the focus of the inquiry should be whether the insured intended or expected to cause environmental harm comparable both as to severity and type with that for which indemnification is sought. For example, an insured's intent to cause mild or minor soil damage should not preclude coverage for wholly improbable, unexpected and unintended damage to groundwater. Ibid.; see also Pittston Co. v. Allianz Ins. Co., 905 F.Supp. at 1302; Morton Int'l, Inc. v. General Acc. Ins. Co. of Am., 134 N.J. at 91, 629 A.2d 831. It is not enough that the insurer prove that the insured expected or intended any injury to the environment. The insurer must prove that the environmental injury expected or intended by the insured was qualitatively comparable in terms of severity and type with the environmental injury that is being remediated.
The question remains what test should be applied in determining whether the insured intended or expected the type of environmental harm that resulted from its conduct. In Chemical Leaman, a majority of the court turned to the traditional standard which requires a showing that the insured subjectively intended to cause the injury resulting from its act. Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d at 989. The majority interpreted Morton as requiring application of the "exceptional circumstances exception" only to "egregious conduct." Ibid. Specifically, the majority concluded that "`exceptional circumstances' define when no reasonable jury could find the insured did not intend or expect to cause property damage because objective circumstancesevidence of prolonged, intentional, or flagrant discharges of known pollutants in the face of regulatory disapprovalestablish that the insured must have intended property damage." Id. at 989 n. 7. Thus, the majority determined that "the presence of `exceptional circumstances' requires a court to enter judgment as a matter of law." Ibid. In less egregious cases, the majority concluded that the jury is to determine whether or not the insured subjectively intended to cause the property damage which is the subject of its claim.
Although the majority's interpretation of Morton may itself be read in a variety of ways, Judge McKee in his concurring and dissenting opinion took the majority opinion to mean that the "exceptional circumstances" standards apply only upon a judge's initial determination that the insured's conduct was egregious. Id. at 1004 (McKee, J. concurring in part, dissenting in part). In contrast, Judge McKee concluded that "[o]ne can only determine if conduct is egregious by examining the `exceptional circumstances' in which it occurred." Ibid. In Judge McKee's view, "`[t]he exceptional circumstances' test... is not an `exception,' but the rule that is to be applied in environmental coverage cases." Id. at 1005 (McKee, J., concurring in part, dissenting in part).
We believe that Morton's exceptional circumstances standards should be applied in determining whether the insured intended to cause environmental harm comparable to that for which indemnification is sought. We do not think that a finding of egregious conduct on the part of the insured is a prerequisite to application of the exceptional circumstances test. Nor do we think that the "exceptional circumstances" test applies only to cases in which no rational jury could reasonably find in favor of the insured. By application of the exceptional circumstances test, the trier of fact is to determine whether the environmental damage that was expected or intended by the insured was qualitatively comparable to the environmental injury that is being remediated.
Our conclusion in this respect is confirmed by the Supreme Court's recent decision in Carter-Wallace that "the jury should have been informed of the Morton factors in order to assist it in assessing [the insured's] state of mind," Carter-Wallace, Inc. v. Admiral Ins. Co. 154 N.J. at 335, 712 A.2d 1116, notwithstanding the Court's finding that the evidence did not show "egregious" behavior on the part of the insured. Id. at 336, 712 A.2d 1116. Our holding also comports with the rationale articulated in Morton that direct "proof of subjective intent to cause environmental harm will rarely be available in *420 coverage litigation." Morton Int'l, Inc. v. General Acc. Ins. Co. of Am., 134 N.J. at 85-86, 629 A.2d 831.
In granting the insurers' motion for summary judgment, the Law Division did not always focus upon the nature of the environmental harm sought to be alleviated. The question was not whether Penick intended or expected to cause any sort of environmental harm, but instead whether it intended or expected to cause environmental harm qualitatively comparable to the environmental injury that is being remediated. In its findings, for example, the Law Division heavily relied on regulatory efforts to stop potentially unsafe working conditions, dust permeation at the plant and record-keeping violations. Other findings related to Penick's discharge of pollutants that had no effect upon soil or groundwater. We do not suggest that the evidence cited was entirely nongermane or irrelevant to the court's inquiry concerning Penick's corporate state of mind. But see Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d at 994. However, such evidence was hardly compelling in the context of a summary judgment motion and was not anchored to the purpose of the court's inquirywhether there were exceptional circumstances that proved Penick intended or expected groundwater and soil contamination by its discharge of pollutants. In sum, we are not entirely confident that the Law Division's inquiry was properly directed. This, coupled with other errors, requires a remand.

B. The Burden of Proof

The Supreme Court's decision in Carter-Wallace was rendered in 1998. The Law Division did not have the benefit of that opinion and, thus, incorrectly placed the burden of proof on CPC to show that the environmental harm was not intended or expected. We are convinced that the Law Division's error seriously infected its analysis of the summary judgment motion.
In reaching this conclusion, we acknowledge our Supreme Court's perception "that in most complex environmental-contamination cases, the burden-of-proof issue will be of limited importance." Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. at 333, 712 A.2d 1116. But we are satisfied that this is one of those "rare case[s] ... in which the ultimate resolution of [the] issue[s] depends [in large part] on which party bears the burden of proof." Ibid. our reasons are several.
First, in making its finding and reaching its conclusions, the Law Division heavily relied upon the testimony of Thaker Tailor, James Murtha and Edward Pietrosky. While one might fairly view the testimony of these disgruntled former employees as a "smoking gun," Morton Int'l, Inc. v. General Acc. Ins., 134 N.J. at 85, 629 A.2d 831, we have previously commented upon questions relating to their credibility. The simple and overriding fact is that these witnesses exhibited immense hostility toward CPC. We do not think that their testimony should go untested. "A case may present credibility issues requiring resolution by a trier of fact even though a party's allegations are uncontradicted." D'Amato by McPherson v. D'Amato, 305 N.J.Super. 109, 115, 701 A.2d 970 (App.Div.1997). As Chief Justice Vanderbilt observed in Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 126 A.2d 323 (1956), "[w]here [persons] of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such character is for the jury." Id. at 494, 126 A.2d 323; see also Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415, 690 A.2d 575 (1997). A trier of fact "is free to weigh the evidence and to reject the testimony of a witness, even though not directly contradicted, when it ... contains inherent improbabilities or contradictions which alone or in connection with other circumstances in evidence excite suspicion as to its truth." In re Estate of Perrone, 5 N.J. 514, 521-22, 76 A.2d 518 (1950).
The burden of proof might well have a substantial impact on the trier of fact's assessment of the credibility of these witnesses. Stated obversely, the credibility problems evidenced by these witnesses' testimony might well bear upon whether the burden of proof has been or will be satisfied. "If the movant *421 is also the party bearing the burden of persuasion with regard to a claim, its initial summary judgment burden is somewhat higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." Moores Federal Practice, § 56.13(1), at 56-138 (3d ed.1997). Because issues of credibility are presented and the insurers bear the burden of proof, it cannot be said that "there exists a single, unavoidable resolution" of disputed questions of fact. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Second, this case presents the classic question of what Penick knew and when it knew it. Resolution of the ultimate issue depends critically upon a determination of Penick's corporate state of mind. In that context, we have repeatedly held that issues hinging upon a party's mental state generally are not appropriate for resolution by way of summary judgment. See, e.g., Jones v. Jones, 242 N.J.Super. 195, 206, 576 A.2d 316 (App.Div.), certif. denied, 122 N.J. 418, 585 A.2d 412 (1990); Bryen v. Krassner, 208 N.J.Super. 639, 642, 506 A.2d 803 (App.Div.), certif. denied, 105 N.J. 583, 523 A.2d 210 (1986); Exxon Corp. v. Wagner, 154 N.J.Super. 538, 540-41, 382 A.2d 45 (App.Div.1977); Allen v. Planning Bd., Tp. of Evesham, 137 N.J.Super. 359, 364, 349 A.2d 99 (App.Div. 1975). The question is fact-sensitive, and allocation of the burden of persuasion is critical to its resolution.

C. Resolution of Factual Issues
We are satisfied that there exists genuine issues of material fact which should have precluded summary judgment. In reaching this conclusion, we recognize that the insurers presented substantial evidence upon which a trier of fact could reasonably find the existence of exceptional circumstances sufficient to bar coverage. That is particularly true with respect to Penick's activities at the Montville site. But even with respect to Penick's discharge of pollutants into the lagoon and its burial of drums containing chemical wastes, practices that now seem archaic, we cannot view the insured's conduct which dates back to the 1950's from the vantage point of twenty-twenty hindsight. As noted by the Third Circuit in Chemical Leaman, 89 F.3d 976, "[f]or example, it is a matter of historical fact that many insureds, acting in accordance with standard industry practices, intentionally discharged pollutants into unlined containment ponds or other inadequate waste treatment systems, but were unaware that groundwater damage would eventually result." Id. at 987.
The motion judge conducted a searching review of the parties' documentary submissions. However, we are convinced that the judge intruded upon the domain of the trier of fact in making findings and drawing conclusions. In deciding whether to grant summary judgment, the motion judge is to "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. at 540, 666 A.2d 146. The judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Ibid. Credibility determinations should be made by a jury and not the judge. Ibid. Here, the motion judge accepted at face value the testimony of witnesses whose credibility was open to question, ignored CPC's evidence indicating that the groundwater and soil contamination was the result of discrete causes over which it had minimal control, discounted Penick's efforts to comply with regulatory demands and promptly remediate the harm, and resolved factual issues on evidence that was not "so one-sided that [the insurers] must prevail as a matter of law." Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)).

IV.
What has been said thus far applies with equal force to the Law Division's application *422 of the known loss doctrine.[3] We are convinced there exists genuine issues of material fact which should have precluded summary judgment.
Under the known loss doctrine, an insurer is protected from risks known to the insured prior to obtaining insurance. Astro Pak Corp. v. Fireman's Fund Ins. Co., 284 N.J.Super. 491, 496, 665 A.2d 1113 (App. Div.), certif. denied, 143 N.J. 323, 670 A.2d 1065 (1995). The doctrine has its roots in the prevention of fraud. Id. at 497, 665 A.2d 1113. As we pointed out earlier, insurance policies are written to protect against uncertainties. "[W]hen they are misused to protect against certainties, fraud results." Ibid. (citing Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co., 997 F.2d 172, 179 (6th Cir.1993)). In Astro Pak Corp. v. Fireman's Fund Ins. Co., 284 N.J.Super. 491, 665 A.2d 1113, we said "[i]f the prevention of fraud is at the heart of [the doctrine], the `loss' must relate to a known occurrence that would trigger indemnification by the insurer." Id. at 498, 665 A.2d 1113. We reasoned that "[o]nly if plaintiff knew that its acts had already subjected it to potential liability because of leakage into the surrounding land, water or air, would the insurers have a claim to a defense." Ibid.
The insurers read Astro Pak as requiring knowledge of potential liability only. We disagree with that interpretation of our opinion. In Astro Pak, we explicitly rejected the view that knowledge of possible contamination equates with knowledge of an insured claim. Id. at 499, 665 A.2d 1113. We think that the better rule is that where there is uncertainty about the imposition of liability and no legal obligation to pay yet established, there is an insurable risk for which coverage may be sought under a third party policy. See Montrose Chem. Corp. v. Admiral Ins. Co., 10 Cal. 4th 645, 692, 42 Cal.Rptr.2d 324, 352, 913 P.2d 878, 905-06 (1995) (en banc); see also Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 518 (3d Cir. 1997). As long as there remains uncertainty
about damage or injury that may occur during the policy period and the imposition of liability upon the insured, and no legal obligation to pay third party claims has been established, we hold that there is a potentially insurable risk for which coverage may be sought in the context of continuous or progressively deteriorating property damage insurable under a third party comprehensive liability policy. We are satisfied that this rule, coupled with the more "narrow" doctrine regarding concealment and misrepresentation, and damages that are "expected or intended" by the insured, sufficiently protect the insurer's interests in combating fraud without diminishing the reasonable expectations of the insured.
So posited, we conclude that genuine issues of material fact exist requiring a plenary hearing. As with the questions addressed previously in this opinion, the fragmented record is insufficient to decide this issue by summary judgment.
The summary judgment is reversed, and the matter is remanded to the Law Division for further proceedings.
NOTES
[1] CPC and Brodson Properties are indistinguishable for the purpose of this appeal. For convenience, we refer to both entities as CPC.
[2] Allstate is the successor to Northbrook Excess & Surplus Ins. Co., the company that issued many of the policies in question.
[3] In its opinion, the Law Division made additional reference to the loss in progress doctrine. That doctrine protects the insurer from risks known to the insured that relate to a continuing loss that had begun before the inception date of the policy. While perhaps there may be conceptual differences between the two doctrines, the Law Division treated them as one, and so do we.