841 A.2d 451 (2004)
366 N.J. Super. 357
Keith GLASS, Plaintiff-Respondent,
v.
Diane GLASS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 19, 2003.
Decided February 6, 2004.
*453 Martin J. Arbus, Ocean, argued the cause for appellant.
Fred M. Klatsky, Red Bank, argued the cause for respondent (Klatsky & Klatsky, attorneys; Fred M. Klatsky, on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD.
*452 The opinion of the court was delivered by CARCHMAN, J.A.D.
Plaintiff Keith Glass ("husband" or "plaintiff"), asserting "changed circumstances," moved to terminate the alimony payments payable to his former wife, defendant Diane Glass ("wife" or "defendant"). The changed circumstances were not an inability to pay the alimony but the narrow claim that defendant's income was sufficient for her to maintain the marital standard of living of the parties. After a hearing, the trial judge concluded that defendant could maintain such a standard on her current income and terminated alimony. He further found that "no equities" weighed in defendant's favor.
We reverse. We hold that a Crews[1] analysis, demonstrating that the supported spouse can maintain the established marital standard of living, does not mandate the termination of alimony but is a significant factor that must be considered with other relevant factors in determining whether alimony should be terminated.
The judge's finding that there were no equities in defendant's favor was also erroneous. The property settlement agreement anticipated defendant's future employment; defendant had a reasonable expectation of permanent alimony in planning her financial future; and defendant has maintained a frugal lifestyle not out of economic necessity, but as a matter of self-determination in the allocation of her resources. The change in circumstances asserted by plaintiff is no change at all but reflects the reasonable expectation of the parties in the performance of the property settlement agreement. We conclude that the termination of defendant's alimony was not warranted under the facts presented here.

I.
We present an expansive recitation of the procedural and factual background to place the issue in context. Plaintiff and defendant, both then twenty-three, were married in 1974. In that year, the parties moved from North Carolina, to Colorado, then finally to California, where plaintiff had been accepted into law school. The parties resided in California from 1975 to 1983, initially living in a 480-square-foot mobile home, where their daughter Samantha (Sami) was born in 1978. Approximately four and a half years later, they moved into a rented three-bedroom apartment, where their son Tyler was born in 1982. Although defendant obtained her master's degree in reading improvement, she did not work after Sami was born.
Initially, the couple had limited financial means. Plaintiff had a start-up law practice, worked as an assistant basketball coach at UCLA, worked at summer camps, and started a basketball school. As finances were limited, the parties never had any domestic help, yard help, a cook, or a baby nurse for either child. They infrequently went out, and seldom went to restaurants. Vacations were limited to visiting his family in New York and her parents in Atlanta. The only other vacation *454 taken was a trip to Tokyo for which UCLA paid. They maintained two cars, neither new, and then only one car after defendant was involved in an accident.
In June 1983, the parties moved to Middletown, New Jersey, where they bought their first house for $110,000, financed by two mortgages to make the purchase. The house, approximately 85-100 years old with no central air conditioning, had six bedrooms, two of which were small storage-type rooms used as playrooms, a large living room, a dining room, a large kitchen, sauna and wraparound porch; there were four floors including a basement. They also bought a second car, a 1978 or 1979 Buick, from plaintiff's parents. The parties did not employ any household help to assist with the cleaning, laundry or cooking, nor regular lawn care or gardening service or regular snow removal service. Between June 1983 and June 1986, the vacations followed the earlier pattern, visiting family in New York and Georgia.
Plaintiff described defendant as "very frugal"defendant shopped at "K-Mart or J.C. Penney's or Sears." Plaintiff and defendant seldom bought things for themselves, and their gifts to each other were not extravagant.
Plaintiff and defendant separated in November 1985. On June 1, 1986, the parties entered into a property settlement agreement (PSA) that was subsequently incorporated, without any judicial scrutiny as to adequacy or sufficiency, into the final judgment of divorce of January 7, 1987. Under the terms of the PSA, the existing stocks, bonds and cash, totaling approximately $6,500, were divided equally. The parties each retained their newly-purchased automobiles. The parties had no IRAs, 401(k)s, or retirement accounts. Significantly, defendant waived any interest in plaintiff's law license, practice or business endeavors, as the PSA provided: "The Wife waives any interest she may have by way of equitable distribution or otherwise in the business enterprises known as Glass and Father and Team Sports, Inc."
The PSA also addressed the issue of spousal and child support. Plaintiff's monthly support obligation for the first two and a half years after the execution of the PSA consisted of $655 in child support and $500 in spousal support. Plaintiff was also obligated to make direct payments for the following expenses: mortgage, utility excluding telephone, homeowners and car insurance, car payment, real estate taxes, school and camp expenses for the children, lawn care and snow removal. Thereafter, plaintiff's spousal support obligation was fixed at $1,000 per month; plaintiff's monthly child support obligation of $655 continued, as well as his responsibility for school and camp expenses for the children.
The PSA terms regarding spousal and child support provided:
5. The Husband shall at his expense maintain at least $100,000.00 worth of life insurance naming the infant children as beneficiaries until there are no more unemancipated children at which time this obligation shall cease. He shall name the Wife as Trustee of the fund.
6. The Husband shall maintain the Blue Cross/Blue Shield type coverage at his expense for the Wife and infant children of the marriage. If the parties become divorced, the Husband shall be responsible for such coverage for the Wife up until 12/31/88, unless the Wife has obtained such coverage elsewhere. He shall, however, continue to maintain it for the children. He shall also be responsible for the uncovered hospital, medical, dental, pharmaceutical, eye care, and psychological expenses for the children. However, no such expense in excess of $50.00 for any one course of *455 treatment shall be incurred without the Husband's or Wife's permission unless in an emergency. Under no circumstances shall the Husband be responsible for the uncovered medical expenses for the Wife.
....
14. For a period of 2½ years from the time of the execution of this Agreement, the Husband shall pay to the Wife the sum of $655.00 child support per month, being $327.50 per child and the sum of $500.00 support for the Wife. In addition he shall pay directly the mortgage and utility expences [sic], (exclusive of telephone) the homeowners insurance, and real estate taxes, the Wife's car insurance and her car payment of $193.00 a month, and school expences [sic] for the children and their camp expenses. He shall also be responsible for the lawn care and snow removal expences. [sic]. Any repairs exceeding $720.00 per year shall be borne equally between the parties by the Husband receiving a 50% credit at the time that the house is sold. No such repair in excess of $100.00 shall be incurred, unless in an emergency, without the Husband's consent or without the Wife's consent.
15. Commencing 2½ years from the execution of this Agreement the Husband's obligation for support to the Wife shall be $1,000.00 per month. In addition, he shall continue to pay the $655.00 per month for the child support for the two infant children and he shall be responsible for the school expenses for the children and their camp expenses. The Wife shall be responsible for the mortgage payment for 28 Cherry Tree Road directly to the mortgage company until such time as the property may be sold.... After title closes, the Husband's obligation to the Wife for the children's expenses and child support shall continue as provided herein, and his obligation to the Wife for her support shall continue at $1,000.00 per month.
....
17. It is understood that this Agreement is intended to resolve all property issues and support issues between the parties past, present and future, including the issue of equitable distribution.
As defendant was not working at the time these terms were agreed upon, the support provided by the PSA constituted her sole income.
When plaintiff moved to New Jersey, he ceased practicing law, as the law school he attended was not accredited. Instead, plaintiff worked as a sports agent for basketball players. Plaintiff also coached high school basketball. In 1986, according to plaintiff's income tax return, plaintiff's gross receipts from his sports agency business amounted to $36,600, and his adjusted gross income was $25,220. Notwithstanding this reported income, from January 1986 to May 1986, plaintiff paid defendant $2,850 per month in alimony and child support. Thereafter, plaintiff's monthly payments were $3,033 to accord with the PSA.[2]
In 1987, according to plaintiff's income tax return, plaintiff's gross receipts increased to $55,500, and his adjusted gross income was $34,741. In plaintiff's certification, however, plaintiff estimated his income at the time the PSA was signed was approximately $60,000. While plaintiff's estimated income seems exaggerated in light of plaintiff's reported income for 1986, the disparity can be reasonably explained by considering plaintiff's practice *456 of receiving advances from his father. Plaintiff's reported income apparently was only a portion of the money on which he lived, as he acknowledged that his expenses exceeded this number.
During the course of the marriage and until 1988, defendant was unemployed. Within a few years of the entry of the judgment of divorce, defendant commenced working at AT & T and continues her employment there. In 1994, defendant sold the marital house and bought a new four-bedroom, one-and-a-half-bathroom house in the same community. Defendant sold the house because the house was expensive to heat and repair; defendant realized that she "was putting money towards the principal but [plaintiff] was getting half no matter what"; and defendant wanted to "eliminat[e] some type of control factor that [plaintiff] had over [her] with money." The PSA terms regarding the marital house were consistent with her financial motives:
7. At the expiration of 2½ years from the execution of this Agreement, either party may cause the sale of 28 Cherry Tree Farm Road, Middletown, Monmouth County, New Jersey, and the other must cooperate in said sale. The net proceeds shall be divided equally except as hereinafter provided. After 2½ years if the parties are still residing at the residence, the maintenance and utilities costs will be equally divided.
8. Each party may keep as his or her own the furniture in his or her own possession at this time; however, the Wife shall pay to the Husband the sum of $5,000.00 at the time of closing of title to 28 Cherry Tree Farm Road, Middletown, N.J. since she is receiving the majority of the furniture and as partial compensation for the 1986 Nissan....
....
15.... The Wife shall be responsible for the mortgage payment for 28 Cherry Tree Road directly to the mortgage company until such time as the property may be sold. She shall be entitled to the deduction from her income tax returns for the real estate taxes and interest on the mortgage. If after 2½ years the Husband is still living on the premises then he shall pay rent of $300 per month to the Wife. If he only maintains an office on the premises then he shall pay $200 per month. If the Husband is not living on premises and the Wife is, he may be permitted to keep his office on premises....
On September 29, 1999, plaintiff filed a notice of motion to terminate support for defendant and to terminate support for their son Tyler, then seventeen years of age.[3] Plaintiff's motion was based on his "understanding [at the time of their divorce] that [plaintiff] would pay support only as long as it was needed for [defendant] to get back to be self-sufficient" and on learning that defendant "earns more than $50,000 per year, together with medical benefits, pension, etc." Also, at the time, plaintiff was paying all of Sami's college expenses. In actuality, defendant's net income for 1998 was $44,621; her total income, including the $12,000 she received in alimony, was $51,751. In 1999, her total income was $59,370 (including a bonus of $9,800). In her case information statement completed in September 1999, defendant listed her net worth as $160,697, with total gross assets at $280,611, and total gross liabilities at $119,914.
In April, the judge granted plaintiff's motion to terminate support, effective January 7, 2000, finding that "defendant has *457 not demonstrated that she continues to need support to maintain the standard of living during the marriage." Defendant filed a notice of appeal. We reversed the order terminating support and remanded the matter for reconsideration. Glass v. Glass, No. A-4569-99T3 (App.Div. May 10, 2001). We concluded that Crews mandated a remand "for a specific finding of the standard of living established during the [parties'] marriage." Id. at 7 (citing Crews, supra, 164 N.J. at 35, 751 A.2d 524).
A hearing in the Family Part followed. In 2000, defendant's W-2 wages were $54,390 and subtracting her retirement contribution in the amount of $3,256.98, her taxable wages were $51,133.99 while her total income was $58,802. In 2001, defendant's reported wages were $60,494, and subtracting her retirement contribution in the amount of $3,628 for that year, defendant's 2001 taxable wages were $56,865.19. Since defendant's divorce from plaintiff, defendant has accumulated approximately $114,000 in savings and investments. Defendant's monthly expenses according to her October 1999 case information statement amounted to $4,580, or $54,960, for the year. Although plaintiff's income was not revealed in detail, he apparently has prospered as a nationally-known and well-publicized sports agent and does not dispute that he is financially capable of paying the agreed upon alimony.[4]
In his decision terminating alimony, the judge observed that we had "remanded the case for a determination of the standard of living enjoyed by the parties during the marriage," and that "[o]nce the court has determined the marital standard of living, it could then compare that standard with [Wife's] current standard of living both with and without alimony in order to decide whether alimony should be terminated either in whole or in part."
He found that during the family's time in California, "the parties lived a very frugal, almost Bohemian, lifestyle. Their lifestyle improved somewhat when they moved to New Jersey, however their lifestyle can be at best described as middle-class." This, the judge determined, "was the standard of living enjoyed during the marriage." The judge rejected defendant's position that plaintiff failed to make "a prima facie showing of changed circumstances because he has not disclosed his financial information." Rather, the judge determined that plaintiff's income was irrelevant because plaintiff's allegation of "changed circumstances" warranting termination of alimony was not "based upon a reduction of his income, but rather ... upon the basis of Wife's increase in income."
As a result, the judge found that once plaintiff establishes "a prima facie showing of changed circumstances based upon Wife's increased income alone, ... the burden shifts to Wife to establish that she cannot maintain herself at the marital standard of living without an award of alimony either in whole or in part." He found that plaintiff satisfied his burden of showing "a change in circumstances relative to Wife's financial position," and stated:
Wife is maintained at or above the marital standard of living based solely upon her own income. Additionally, while maintaining the standard of living enjoyed during the marriage, the Wife has also accrued substantial assets in excess *458 of $100,000. The court finds that [defendant] is currently living in a home comparable in useable size and location to the marital residence in which she only resides. Wife also testified to the fact that she shops at the same stores, eats at the same restaurants and can afford to purchase a new automobile. The court finds the wife capable of maintaining the standards of living enjoyed during the marriage solely on the basis of her earned income.
Critically, the judge found no "equities that weigh in favor of not terminating Husband's alimony obligation." Rather, defendant failed to show by a preponderance of the evidence that she gave any form of consideration "in exchange for a guarantee of support" to make reducing or terminating alimony inequitable. Determining that defendant's "income alone is sufficient to maintain her above the marital standard of living" and that defendant failed to show "equities sufficient to estop Husband from seeking a termination of his alimony obligation," the judge granted plaintiff's motion to terminate alimony. In so doing, the judge noted that defendant's "increased wealth is a result of her increased earning capacity and is not the result of a voluntary decrease in [defendant's] standard of living." He also noted defendant's admission that she is using alimony as a "safety net."
On appeal, defendant asserts that the judge erred in concluding that plaintiff met his burden of establishing changed circumstances, that he failed to properly assess the intention of the parties at the time of execution of the PSA, that he failed to properly consider equities in defendant's favor and that he erred in his determination of defendant's standard of living. In response, plaintiff asserts that the judge correctly concluded that defendant's income exceeds her expenses, she continues to live in the same lifestyle as at the time of the marriage, and the judge did not err in terminating support. At oral argument, plaintiff questioned the future vitality of permanent alimony, suggesting that the ability to modify under Crews and Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980), renders permanent alimony anachronistic.

II.
We begin our analysis by setting forth basic but relevant principles regarding permanent alimony and modification of alimony awards or agreements. Permanent alimony is of statutory origin, N.J.S.A. 2A:34-23(b), and reflects "the important policy of recognizing that marriage is an adaptive economic and social partnership." Cox v. Cox, 335 N.J.Super. 465, 479, 762 A.2d 1040 (App.Div.2000). "[M]arriage is a joint enterprise whose vitality, success and endurance is dependant upon the conjunction of multiple components, only one of which is financial." Sally F. Goldfarb, Marital Partnership and the Case for Permanent Alimony, 27 J. Fam. L. 351, 354-55 (1988-89) (quoted in Cox, supra, 335 N.J.Super. at 479-80, 762 A.2d 1040). Imposing an obligation by judicial mandate or agreeing to support "permanently" reflects the judicial and, where agreed upon, personal recognition of the marital relationship and partnership.
Despite an agreement to provide spousal support without limitation as to time, "[t]he duties of former spouses regarding alimony are always subject to review or modification by our courts based upon a showing of changed circumstances." Miller v. Miller, 160 N.J. 408, 419, 734 A.2d 752 (1999). This, too, is governed by statute. N.J.S.A. 2A:34-23 (authorizing a court to revise support orders, including permanent alimony, "as circumstances may require."). The party moving for *459 modification "bears the burden of making a prima facie showing of changed circumstances." Miller, supra, 160 N.J. at 420, 734 A.2d 752 (citing Lepis, supra, 83 N.J. at 157, 416 A.2d 45).
The supporting spouse's obligation hinges on the parties' economic life during their marriage. Lepis, supra, 83 N.J. at 150, 416 A.2d 45. "The needs of the dependent spouse and children `contemplate their continued maintenance at the standard of living they had become accustomed to prior to the separation.'" Ibid. (citing Khalaf v. Khalaf, 58 N.J. 63, 69, 275 A.2d 132 (1971)). Accordingly, the supporting spouse has a continuing responsibility "to contribute to the maintenance of the dependent spouse at the standard of living formerly shared." Id. at 150, 152, 416 A.2d 45. However, "a decrease is called for when circumstances render all or a portion of support received unnecessary for maintaining that standard." Id. at 153, 416 A.2d 45.
The Court has also instructed that "the standard of living experienced during the marriage ... serves as the touchstone for the initial alimony award and for adjudicating later motions for modification of the alimony award when `changed circumstances' are asserted." Crews, supra, 164 N.J. at 16, 751 A.2d 524. "The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income." Hughes v. Hughes, 311 N.J.Super. 15, 34, 709 A.2d 261 (App.Div. 1998).
Crews therefore requires that where the marital standard has not been established, a judge addressing a modification application must make such determination. Crews, supra, 164 N.J. at 16-17, 35, 751 A.2d 524. This was the basis for our original remand, after which the judge ultimately found that the parties lived a "middle class" lifestyle both during the marriage and at the time of hearing.
Lastly, we have recognized that the modification of agreements based on changed circumstances applies not only to a significant diminution of resources of the supporting spouse that impairs that spouse's ability to meet his or her support obligations, but to "a significant change for the better in the circumstances of the dependent spouse," Stamberg v. Stamberg, 302 N.J.Super. 35, 42, 694 A.2d 592 (App. Div.1997) (emphasis added), that may obviate the need for continued support. This is the framework within which we consider the propriety of the trial judge's decision to terminate alimony.
In his assessment of the evidence before him, the judge determined that the parties lived a "frugal" if, nevertheless, "middle class" lifestyle. He determined that plaintiff was able to support her lifestyle from her earnings and was able to allocate a portion of her earnings combined with her support to create a "safety net," or savings component, unlike during the marriage. In tallying defendant's modest expenses and comparing it with her total earned and support income, the judge, with some accounting justification, concluded that in essence the "numbers" did not support a finding of need and terminated support.
The "numbers" inquiry and analysis was too narrow and limited. Here, related principles become relevant. Both Lepis and Crews inform us that the marital standard of living is the "touchstone" of a change of circumstances application, but other considerations are similarly compelling. The agreement between the partiesthe contract upon dissolutionis entitled to significant consideration. As we noted in Avery v. Avery, 209 N.J.Super. 155, 160, 507 A.2d 242 (App. *460 Div.1986), "there is a strong public policy favoring stability of consensual arrangements for support in matrimonial matters...." (citing Lepis, supra, 83 N.J. at 148, 416 A.2d 45). A judge's determination must be based not only on numbers, but also on "`what, in light of all the facts presented to it, is equitable and fair, giving due weight to the strong public policy favoring stability of arrangements.'" Rolnick v. Rolnick, 262 N.J.Super. 343, 353, 621 A.2d 37 (App.Div.1993) (quoting Smith v. Smith, 72 N.J. 350, 359-60, 371 A.2d 1 (1977)).
In determining whether an agreement is fair and equitable, we must consider issues such as the adequacy of the agreement at inception, the presumed understanding of the parties at that time, the reasonable expectation of the parties during the life of the agreement, the manner in which the parties acted and relied on the agreement as well as the previously stated principle that agreements by their very nature carry with them a stability that must be respected at the time of enforcement or even during periods when modification is at issue. See Konzelman v. Konzelman, 158 N.J. 185, 193, 729 A.2d 7 (1999) (stating that voluntary agreements "enabl[e] parties to order their personal lives consistently with their post-marital responsibilities," and therefore, are given "prominence and weight"); Conforti v. Guliadis, 128 N.J. 318, 323, 608 A.2d 225 (1992) (recognizing that "[m]arital property settlement agreements `involve far more than economic factors' and must serve the strong public and statutory purpose of ensuring fairness and equity in the dissolution of marriages"); Petersen v. Petersen, 85 N.J. 638, 645, 428 A.2d 1301 (1981) (reiterating the desirability of "[v]oluntary accommodations regarding matrimonial differences"); Ozolins v. Ozolins, 308 N.J.Super. 243, 249, 705 A.2d 1230 (App. Div.1998) (reversing the termination of alimony and finding that the judge erred when, among other things, "the judge did not factor in the principle that the amount of alimony here was set originally by the parties themselves," as such agreements ordinarily include trade-offs between the parties); Savarese v. Corcoran, 311 N.J.Super. 240, 248-49, 709 A.2d 829 (Ch. Div.1997) (finding the parties intended the PSA, which included an anti-Lepis clause, to be an integrated agreement, in light of what the parties "actually understood at the time and how they conducted themselves subsequently"), aff'd, 311 N.J.Super. 182, 709 A.2d 799 (App.Div.1998). Cf. Dilger v. Dilger, 242 N.J.Super. 380, 385, 576 A.2d 951 (Ch.Div.1990) (stating that to determine whether defendant's retirement is a changed circumstance warranting modification of alimony, the court must first "examin[e] the intention of the parties as expressed in the agreement itself").
At the time plaintiff and defendant entered into the PSA, no findings were made as to the adequacy or sufficiency of the agreement. What was known was that defendant was not employed, was caring for two children, was maintaining a household and clearly could not exist on the limited support provided by the PSA. The parties contemplated and understood that she would be employed in the future and be receiving income. Avery, supra, 209 N.J.Super. at 161-62, 507 A.2d 242 (finding that "plaintiff's increased earnings in light of her needs do not represent changed circumstances permitting termination of alimony," particularly as "the agreement obviously contemplated a significant increase in plaintiff's earnings in order to maintain the former life style of the family unit").
The PSA was an integrated agreement. It not only resolved issues of custody and visitation but financial matters including *461 equitable distribution and spousal and child support. No one element stands alone and can be read without reference or consideration of the others. See Conforti, supra, 128 N.J. at 323-24, 608 A.2d 225 (finding that the lease that plaintiff sought to modify "was but one component of a much broader agreement encompassing a host of domestic issues that arose when [the parties] ended their marriage," and therefore, "must be considered within the framework of the judicially-sanctioned allocation of marital property"); Shifman v. Shifman, 211 N.J.Super. 189, 195, 511 A.2d 687 (App.Div.1986) (finding that "trade-offs between the distribution of assets and support obligations ... may be taken into account along with all other circumstances in determining whether an award of alimony should be modified"); Savarese, supra, 311 N.J.Super. at 248-49, 709 A.2d 829 (upholding the anti-Lepis provision in the PSA as part of the parties' overall agreement, which the parties had intended to be "an integrated agreement, where no provision is meaningless or unenforceable"). In this regard, defendant abided by the terms of the PSA, including the low amount of support and the waiver of interest in plaintiff's businessadequate consideration to support an agreement for permanent supportwith the apparent understanding that the PSA provided her permanent alimony. Morris v. Morris, 263 N.J.Super. 237, 244, 622 A.2d 909 (App.Div.1993) (finding that in exchange for fixed alimony until a certain date, plaintiff had given up "her claim to equitable distribution and substantially higher alimony," and therefore, finding no inequity in holding defendant to his bargained-for result). The full appreciation of this understanding and interpretation is appropriate when the PSA is viewed as a whole.
Further refinement of the facts is illuminating. Defendant did not seek to advance her own career after obtaining a graduate degree in California when plaintiff received his law degree, and defendant was unemployed when the parties separated. No apparent value was attached to plaintiff's law degree other than the contemplation that his knowledge of the law and aspiration to be a sport's agent would result in financial security that would serve the interests of both parties and partners to the marriage. We fail to understand why the judge did not consider what appears obvious to us that defendant waived any interest in plaintiff's business, present or future, in consideration of her future security provided by permanent alimony. Lynn v. Lynn, 91 N.J. 510, 512-13, 516-17, 453 A.2d 539 (finding that as defendant supported plaintiff while plaintiff attended medical school and the parties were left in extremely "divergent financial situations" as a result of their divorce, the court should have awarded defendant alimony to provide fairly for her "present and future needs" rather than attempting to value plaintiff's enhanced earning capacity). That she was willing to abandon their mutual dream of plaintiff's eventual success does not diminish or eliminate the value of that abandonment. Guglielmo v. Guglielmo, 253 N.J.Super. 531, 543-44, 602 A.2d 741 (App.Div.1992) (finding "that a spouse who maintains the home while her husband's career advances should share in the rewards of their combined efforts" and that "[t]he then-existing earning potential of the working spouse may be shared by the spouse who kept the home").
During the course of the hearing on remand, the judge said:
the Appellate Division is rather clear on what it says we should do here. It says that, "On remand the motion judge shall allow such additional evidence as may be relevant to determine the standard of living enjoyed by the parties during the marriage, and the standard of living permitted *462 to defendant by her current income, both with and without the plaintiff's support payments."
Let's assume for the sake of discussion that we do that and that now we have a record that's replete with that information. It would seem to me that that's all I'm supposed to in this case. I don't have to do anything else.
Then, on the last day of trial, during defense counsel's cross-examination of defendant, this colloquy occurred:
MR. KLATSKY: Your Honor, they're going into the terms of the agreement and how it was negotiated. There's absolutely no relevance as to her lifestyle for that. I object, Your Honor.
THE COURT: Furthermore, I mean, there are other problems with that type of testimony so when you begin to ask who did what to whom. I don't see the point of even getting into it.
MR. ARBUS: Well, I think it's a critical point. And I understand that the Court feels
THE COURT: It is not part of the remand.
MR. ARBUS: I understand the Court feels restrained by what's in that last paragraph of the remand, I understand that.
THE COURT: Yes.
MR. ARBUS: But I think it's a critical part of our overall case and
THE COURT: Well, I'll tell you, I will allow you to put it in but, you know, I'll give it whatever value I believe, and that way you'll preserve it in case you intend to appeal.
The judge misconstrued our remand. While we ordered consideration of marital lifestyle consistent with Crews, we did not limit the hearing to that issue. All relevant considerations should have been addressed, including the parties' understanding at the time of execution of the PSA. Failure to consider those facts reduces the changed circumstances hearing to an accounting analysis, a result neither mandated nor contemplated by Lepis, Crews or any cases interpreting those holdings. Surely, the analysis requires careful scrutiny of financial needs and resources to maintain a marital lifestyle, but it involves as well understandings, aspirations and expectations.
We are mindful of the admonition in Lepis that "objective notions of foreseeabilitywhat the parties or the court could or should have foreseenare all but irrelevant." Lepis, supra, 83 N.J. at 152, 416 A.2d 45. We are speaking here of the reasonable expectations of the parties as they entered into the PSA. The circumstances claimed to be changed by defendant's income are, in reality, the circumstances contemplated by the very agreement plaintiff now seeks to abrogate. Aronson v. Aronson, 245 N.J.Super. 354, 363, 585 A.2d 956 (App.Div.1991) (looking to the "contemplation of the parties" in interpreting a PSA on application for termination of alimony due to changed circumstances). The failure of the trial judge to consider these elements is the basis for our finding a deficiency in his conclusion that no equities existed to support defendant's position. To the contrary, the equities were substantial.
The parties entered into a voluntary agreement contemplating that defendant would be employed in the future with income to supplement her support. While on the surface, she maintains a frugal lifestyle, she has made a determination as to allocation of her resources, a factor not considered by the judge. No one would fault her or legitimately question her expenditures if, as a professional, she purchased clothes at a more upscale outlet than K-Mart, bought a new car, ate in *463 restaurants more often or more substantial than fast-food establishments, or hired domestic help. Guglielmo, supra, 253 N.J.Super. at 543-44, 602 A.2d 741 (finding that "[w]here a family's expenditures and income had been consistently expanding, the dependent spouse should not be confined to the precise lifestyle enjoyed during the parties' last year together," but rather, "[d]efendant's income picture should be viewed with an eye toward the future, since it was to this potential that both parties contributed during the marriage," and thereby, rejecting defendant's contention "that plaintiff is attempting to improve her lifestyle beyond that which she enjoyed during her life with him").
However, she has chosen not to do so. Instead, she has allocated those funds that would not be challenged if spent, to a modest savings fund for her future, a fact that on this record is certainly not offensive to the maintenance of the middle-class lifestyle described by the judge. Accord Ruzic v. Ruzic, 281 N.W.2d 502, 505 (Minn.1979) (noting that "the property and alimony awarded [plaintiff] will permit her to save much of what she earns"); LaVoi v. LaVoi, 505 N.W.2d 384 (N.D.1993) (upholding the spousal support award, which, among other things, gives plaintiff "a modest opportunity to plan some retirement savings"); In re Marriage of Hubert, 159 Wis.2d 803, 465 N.W.2d 252, 258 (App. 1990) (finding error when the family court failed to "individualize the standard of living" and denied plaintiff's request "to set maintenance at a level that would permit her to continue saving and investing"); cf. In re Marriage of Olar, 747 P.2d 676, 681 (Colo.1987) (stating that "[t]he determination of what a spouse's `reasonable needs' are, is dependent upon the particular facts and circumstances of the parties' marriage" and finding that the court's denial of a maintenance award for the wife did not "adequately address the unfairness which results when one spouse sacrifices his or her own educational goals to support his or her spouse"); Vadala v. Vadala, 145 N.C.App. 478, 550 S.E.2d 536 (2001) (reversing the court's judgment denying plaintiff alimony where the court failed to consider "the parties' pattern of savings... in determining the parties' accustomed standard of living"). But see Mallard v. Mallard, 771 So.2d 1138, 1140-41 (Fla.2000) (holding that "alimony may not include a savings component" and that "[a]ny accumulation of marital assets occasioned by the frugality of the parties during the marriage is taken into consideration by equitable distribution"); Kuroda v. Kuroda, 87 Hawai'i 419, 958 P.2d 541, 551-52 (App.1998) (concluding that the supported spouse's "ability to continue to save and build up one's net worth is not a valid standard of living consideration justifying the award of increased alimony/spousal support"). See generally Kelly L. DeGance, "Savings Alimony": The Struggle for Fairness in Permanent Alimony Awards, 2 Fla. Coastal L.J. 317 (2001) (criticizing Florida's failure to "recognize the importance of allowing flexibility in determining an equitable alimony award" in barring inclusion of a savings component in alimony awards). She cannot be faulted, penalized or prejudiced by making judicious choices as to the allocation of her income including her alimony. Accord In re Marriage of Weibel, 965 P.2d 126, 129-30 (Colo.Ct.App.1998) (finding that "a former spouse receiving maintenance, not the obligor, should be permitted to benefit from his or her frugality and should not be penalized for choosing a more austere life style" and that "an appropriate rate of savings ... can, and in the appropriate case should, be considered as a living expense when considering an award of, or reduction in, maintenance").
Of course, when measured against the absence of any savings during marriage, *464 she is indeed prejudiced by her concern for her future in allocating her available resources. This mechanical application of Crews creates an inequity that we refuse to ignore. Part of her decision-making as to the sale of her premises was to reduce her expenses and avoid plaintiff's control of her fiscal matters. To premise a change of circumstances on what is her legitimate allocation of her funds under the rubric of lack of need maintains plaintiff's fiscal control over defendant, a circumstance that should no longer be an issue between these parties. We decline to make it one.
As we noted earlier, in Stamberg, we recognized that a change of circumstances may include a "significant" change for the positive in the supported spouse's financial fortunes. Stamberg, supra, 302 N.J.Super. at 42, 694 A.2d 592. In writing for the court, Judge (now Justice) Long chose her words carefully and by using the phrase "significant change," she informed us that a standard requiring more than a modest income would be required before the equitable remedy of modification of an extant agreement would be invoked. The "change" evidenced here is certainly not "significant" enough to warrant the proposed remedy of termination of support.
We close by briefly addressing plaintiff's oral argument suggestion that Lepis and Crews imply the end of permanent alimony. Carried to its logical conclusion, all "permanent" alimony would be simply rehabilitative alimony as that is defined by the statute and case law. N.J.S.A. 2A:34-23; Cox, supra, 335 N.J.Super. at 474-76, 762 A.2d 1040. Such argument misunderstands the nature of an application under those cases.
An application to modify an agreement is an exception, not the rule. Judges and litigants alike contemplate that agreements entered into in good faith containing provisions such as permanent alimony shall be performed in accordance with their terms. The exception is that circumstances will arise that make enforcement of the agreement inequitable. These circumstances do not include a supported spouse earning a modest sum of money that will allow her to save for her future. Cf. Capodanno v. Capodanno, 58 N.J. 113, 120, 275 A.2d 441 (1971) (setting alimony at an amount "necessary in the light of [plaintiff's] present earnings to maintain her in the pattern of living to which she had become accustomed prior to the separation, and to allow her to retain reasonable savings to provide for an uncertain future"). And that is especially true when the supporting spouse, without any fiscal limitation, is able to afford the limited sums being paid. We need not restate that permanent alimony is not only enabled by statute, N.J.S.A. 2A:34-23; it is enabled by parties agreeing in good faith that while the marital partnership has dissolved, the contributions to the marriage warrant the continued recognition of what did exist and the needs that exist in one's daily life.
The trial judge failed to consider all of the relevant equities here and improperly terminated support. We reverse and dismiss plaintiff's application to terminate support.
The trial judge denied counsel fees as well, in good measure prompted by the grant of relief to plaintiff. We remand for reconsideration of defendant's counsel fee application.
We reverse the order terminating plaintiff's alimony obligation to defendant; we remand solely for reconsideration of defendant's application for counsel fees. We do not retain jurisdiction.
NOTES
[1] Crews v. Crews, 164 N.J. 11, 751 A.2d 524 (2000).
[2] Plaintiff's support payments for 1986, then, totaled $35,481, which obviously exceeded his reported adjusted gross income of $25,220 for that year.
[3] Other cross-motions were filed that are not relevant to this appeal as well as issues regarding child support that were resolved by the parties.
[4] The trial judge had the benefit of plaintiff's Case Information Statement. See Isaacson v. Isaacson, 348 N.J.Super. 560, 586, 792 A.2d 525 (App.Div.), certif. denied, 174 N.J. 364, 807 A.2d 195 (2002).