**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0139-24

ROBIN COLEMAN,

      Plaintiff-Respondent,

v.

KARL COLEMAN,

      Defendant-Appellant.

_____

        Argued March 5, 2026 – Decided April 30, 2026

        Before Judges Mawla and Marczyk.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FM-01-0379-23.

        Karl Coleman, appellant, argued the cause on appellant's behalf.

        Kelly T. McGriff (Kelly McGriff Law, LLC) argued the cause for respondent.

PER CURIAM

Defendant Karl Coleman appeals from a July 16, 2024 final judgment of divorce, which dissolved his marriage with plaintiff Robin Coleman, allocated the parties' debts and assets, and awarded defendant alimony. We affirm in part and reverse and remand in part for the reasons expressed in this opinion.

I.

We derive the facts from the record and the court's decision entered following a four-day trial.

A. <u>Trial Testimony</u>

The parties were in a long-term marriage and were each sixty-three years old at the time of trial. One child was born of the marriage, who is now an adult. Plaintiff also has three adult children from a prior relationship.

In 1985, plaintiff began working for the Division of Child Protection and Permanency (Division), and as a result of her service, qualified for a pension. In 1997, she purchased a home in Egg Harbor Township, where she lived with her three older children.

Defendant worked as a construction laborer while attending college. In 1984, he graduated with a bachelor's degree but continued working as a laborer. He joined Laborers' International Union of North America (Laborers' International) and Laborers' Local 415 (Local 415) and had premarital pensions

A-0139-24

with each union. One month before his marriage to plaintiff, he joined Laborers' Local 1174 (Local 1174) and later vested in its pension system.

After the parties married in 2000, defendant moved into plaintiff's home, where he resided for almost the entirety of their marriage and throughout the divorce litigation. When they married, plaintiff was employed with the Division and earned approximately $40,000 per year, and defendant earned about $600 per week from his work with Local 1174. For the duration of the marriage, plaintiff provided defendant with health insurance through her employment.

Shortly after they were married, plaintiff began a two-year master's program in social work. Her degree was paid for by the State through her employment with the Division. The program allowed plaintiff to attend school full-time and receive half of her salary.

As a result, plaintiff struggled to pay her bills and sought financial assistance from defendant, but he did not contribute, leaving her to pay expenses, including the mortgage, property taxes, utilities, and costs of childcare. By the time plaintiff obtained her master's degree in 2002, her car had been repossessed and her premarital home was headed into foreclosure, prompting her to declare bankruptcy.

3

The parties both testified they kept many of their finances separate in the earlier part of their marriage, with each paying for their respective auto insurance policies, cell phone plans, credit cards, and tax debts. Plaintiff claimed she paid the mortgage on the home for the entirety of the marriage. Defendant paid the electric bill for most of their marriage.

In 2015, the parties separated, and defendant temporarily moved out of the home until they reconciled five months later. Upon their reconciliation, defendant began giving her $900 per month for bills. She would deposit the money into a "household account" and use it to pay living expenses. The parties purchased an auto insurance policy together and added their daughter to the plan. In 2020, plaintiff added defendant to the home's deed in order to qualify for credit to purchase solar panels.

Defendant testified he contributed throughout the marriage and they "basically split everything." He claimed plaintiff's poor financial decisions caused her money troubles at various points in their marriage. During those times, he would loan plaintiff money, pay for her gas, and buy her lunch. From the start of the marriage, he recounted he paid plaintiff $900 each month for household expenses and bills, while plaintiff paid $1,100 towards the monthly

A-0139-24

mortgage. He stated he helped whenever plaintiff failed to pay their monthly expenses.

Defendant disapproved of how much plaintiff spent on her adult children, including their daughter. By May 2023, plaintiff accumulated approximately $18,000 in credit card debt. The debt was normal for plaintiff but she noted some of it belonged to their daughter. Defendant described his monthly expenses, including approximately $162 for dog food and $300 for restaurants.

In 2018, defendant retired at the age of fifty-seven, explaining "[t]hirty-nine years as a laborer is a lot," and he did "the hardest work in the construction field." He had a rotator cuff and knee injury, sleep apnea, plantar fasciitis, sciatica, and hypertension. Defendant testified he could not return to work as a laborer "because the contractors want younger guys . . . pouring concrete and working with bricklayers and . . . at this age you can't do it."

Upon retirement, defendant received a $50,000 annuity and used it, in part, to make repairs to the home, including replacing the gutters and windows, installing insulation, planting a tree line, building a fence, painting, maintaining the pool, and building a gazebo. He made most of the repairs himself. Defendant also began receiving payments from his three pensions and Social Security, which total $5,461 per month.

A-0139-24

In January 2020, plaintiff retired from the Division. At the time, she earned approximately $103,000 per year. She began receiving a pension payment of $5,276 per month, which was reduced by $724.39 to pay back a pension loan. The loan balance was less than $3,000 in 2024.

In October 2020, plaintiff accepted part-time employment earning $75,000 per year with discretionary bonuses and profit-sharing. Her compensation totaled $114,747.78 in 2023. Two paystubs from April 2024 show plaintiff's semi-monthly net pay was $4,907.03 and $3,183.93, respectively. At trial, plaintiff estimated her gross monthly income from all sources was $14,116. She intended to retire after their daughter completed graduate school.

The parties' daughter graduated college in May 2023. Plaintiff paid for her to live in off-campus housing for her senior year. She also paid for food, sorority dues, and club fees. Plaintiff did not request any contribution from defendant. These expenses totaled $1,033 per month. At the time of trial, their daughter resided in New York City and attended graduate school at Columbia University, which she funded with a scholarship and a loan. Plaintiff also gave the daughter a biweekly allowance of $600.

A-0139-24

In July 2023, defendant retained an appraiser who valued the parties' home at $240,000. As of May 2024, the mortgage balance was $120,110.18. The parties stipulated to the appraiser's expertise, and he testified at trial.

Defendant expressed his desire to purchase plaintiff's equity in the home because she was better financially equipped to purchase a new home than he was. If the court declined to permit him to purchase plaintiff's equity, he preferred the home be sold because he believed it would yield greater proceeds. However, when the court asked defendant how much he was willing to offer for plaintiff's equity, defendant could not determine a number, asserting the home value increased since its appraisal so a new appraisal was needed. Plaintiff explained the home held sentimental value to her and she wanted to buy out defendant's equity. She offered to pay defendant one-half of the net equity, defined as the appraised value less the mortgage divided by two.

B. The Trial Court's Findings and Decision

The trial court found plaintiff and the appraiser credible and "believed . . . most, if not all, of what [defendant] said, too." However, the court noted the case did not revolve around credibility. The most complicated part of the case was that the parties were "in the twilight years of their earning capacities." The major issues were the alimony and "equitable distribution, primarily of the

7

home, but to some degree of the retirement vehicles," which were "intimately intertwined."

The court addressed the equitable distribution statutory factors in N.J.S.A. 2A:34-23.1, which findings we need not repeat here. We simply highlight the court's salient findings.

The court found although both parties were generally healthy, defendant's age and health issues due to his prior employment impacted both equitable distribution and alimony. Although plaintiff owned her home prior to the marriage, the court also considered she put defendant's name on the deed as well as the repairs and renovations defendant made to the home. Even though the parties disputed the extent of defendant's role in repairing the home, "there is [no] question that both parties treated that home as their own . . . long before [defendant's] name was ever put on the deed." For these reasons, the court found defendant "entitled to a substantial portion of the equity in the home." Because the parties' pensions were in pay status, the court noted it would consider them in its alimony calculation.

The court found the parties live a middle-class lifestyle. Plaintiff clearly "earned substantially more than" defendant in the latter part of their marriage. The parties had "pooled their incomes" and had an "arrangement in which they

8

both contributed, [though] not equally, . . . throughout their marriage to the carrying costs of their marital budget."

The court analyzed the parties' marital lifestyle budgets and needs in their Case Information Statements. It quantified the marital lifestyle at approximately $6,000 per month. The court observed although plaintiff's expenses were greater, they were mostly due to her daughter who, once graduated, would reduce plaintiff's expenses and allow both parties to live comparably with the marital lifestyle.

The court found the parties contributed to each other's earning power by working together as a "marital unit." They likewise each contributed to the marital home as the court had noted previously. The court evaluated the parties' claims related to the value of the home. It was "puzzled" by defendant's position he wanted to buy out plaintiff because he did not make an effort to value the property and could not articulate a buyout figure to the court. As for the marital debt, the court observed plaintiff was "willing to take on a disproportionate share of the debts and liabilities of the parties," which it would consider in its analysis.

Pursuant to its equitable distribution analysis, the court ordered the parties to retain their respective vehicles and maintain their own bank accounts and debts. It noted the parties agreed to split their tangible property, and, if needed,

9

they would mediate the issue. It ordered an equal distribution of the marital portion of any retirement or investment funds plaintiff accumulated with her current employer as of the date of the complaint for divorce.

The court noted the parties' federal tax liability would be resolved as placed on the record at trial, which was that plaintiff would be bearing more of the debt. It ordered any remaining joint State tax debt to be split equally and paid from the equity in the marital home. The court ordered the parties to pay their daughter's college loan equally for three years, after which the daughter would assume the payment.

As for the home, based on the trial evidence, the court permitted defendant, at his expense, to have the appraiser re-appraise the home. It then granted plaintiff the right of first refusal to buy out defendant's interest in the home by giving him a written offer within ten days of the appraisal. If plaintiff did not exercise her right, then defendant would have ten days to give her a written buyout offer. And if neither party exercised their right to a buyout, the home would be sold, with the net proceeds apportioned sixty percent to plaintiff and forty percent to defendant.

The court found the marital retirement assets could not simply be divided equally because defendant who has a

stream of funds through his retirement, which primarily are premarital, would be receiving a pretty good share of [plaintiff]'s retirement funds. And [plaintiff] would be left with a much smaller cash flow from her retirement fund than [defendant] would be. And that may work now because [the court] can adjust [for] . . . [plaintiff]'s income[,] but it's not going to work in the long run.

Considering "all of the equitable distribution factors" and accounting for its alimony analysis, the court concluded each party would retain their own premarital and marital retirement assets and loans thereon free and clear of an equitable distribution to, or contribution by, the other party. The court found, after plaintiff paid off her debt and retires, "the amount of money [she] will be receiving from her retirement vehicle is fairly equal [to and] within a few hundred dollars of the amount of cash flow [defendant] will be receiving from his three retirement vehicles."

The court next addressed the alimony statutory factors under N.J.S.A. 2A:34-23(b). It adopted its relevant findings from its equitable distribution analysis, including the marital lifestyle findings. Again we need not repeat the court's findings under every factor.

As for needs, the court credited defendant's argument his budget would increase after he lost his health insurance through plaintiff's employment. It

11

found plaintiff would have the ability to pay for health insurance as long as she remained with her current employer.

The court found defendant could not return to work as a full-time laborer but could earn an income. Given defendant's age, work history, absence from the job market, and his Social Security, the court imputed $22,320 per year to him, less than minimum wage, accepting defendant could not earn more than that sum without a reduction in Social Security.

The court then addressed factor four, the "standard of living established in the marriage," restating its finding the joint lifestyle was $6,000 per month. For factor five, the "earning capacity, educational levels, vocational skills[,] and employ[ability] of the parties," although the court found plaintiff had a greater earning capacity than defendant, it "d[id not] expect that[ to] last[] forever," because she was sixty-three years old, "had already retired once," and testified "she took [her current] job as a way to help her children." Consistent with its equitable distribution findings, the court found both parties made financial and non-financial contributions to the marriage.

The court emphasized its finding under the equitable distribution factors that defendant had a stream of income from his pensions, which it noted was a significant factor in the alimony award. Although there was no pendente lite

12

support paid to defendant, the court observed plaintiff had "the lion's share of the parties' liabilities and . . . costs of the marital expense."

The court reiterated defendant's monthly receipts from all sources totaled "$5,461, which is close to carrying his own budget." It found the $22,320 income it imputed to defendant would amount to $1,395 each month if tax-effected at a twenty-five percent rate. Thus, defendant would have a total monthly income of $6,856 and arguably no need for alimony. However, the court observed defendant's budget did not consider that he would have to acquire new health insurance, which would cost him approximately $1,000 per month. The court also considered that in less than two years, defendant would be sixty-five and eligible for Medicare at little to no cost.

The court found plaintiff earned approximately $7,219 per month. It reached this figure by averaging plaintiff's net income from the prior two years. After repayment of her pension loan, plaintiff would have $3,956 per month in pension income. Thus, plaintiff's net income would be approximately $11,175 per month. The court noted plaintiff did not intend to continue working and would likely work for only the "next couple of years" to help her daughter pay for graduate school. It reasoned as follows:

> [The court] d[id]n't want to say, [plaintiff], as long as
> you are working, you are going to be paying X, and it

13

doesn't make sense to her to keep working at that level. [The court] d[id]n't want to give her disincentive . . . to leave what seems to be [a] fairly lucrative job, and again, no disrespect intended to [the parties], . . . who are . . . in the twilight years of their earning potential. . . . She is at a time in her life where people like to start thinking about retirement . . . but [she] was given this opportunity and took it.

The court also did not want plaintiff to quit her job for feeling like she was working only to give the "lion's share to" defendant. It credited defendant's testimony that "if the parties had disagreements over anything, it was over how the[y] . . . spent their money." It continued:

Oddly enough, . . . that's a factor that's important to [the court's] analysis. Because it wasn't your typical ["]let's throw all our money into one account["] and ["]let's just make decisions together.["] They clearly[,] for [twenty-]some years[,] coexisted where [plaintiff] made more than [defendant]. She contributed a disproportionate share [to] the cost of their life[style], but she had money that [was] leftover and she had . . . boxes from Amazon coming, and she sent money to her adult children from another relationship, and she did things for [their daughter] that [defendant] didn't necessarily agree with. But that was her lifestyle. The lifestyle was th[at] extra money wasn't banked. It wasn't put away into an account where they shared. . . . She used it in a way that made her happy. And [the court] believe[s] that that was part of their lifestyle . . . .

The court noted it did not give a great amount of weight to this consideration, but it was in the "back of [the court's] mind" in fashioning an alimony award.

14

The court concluded defendant was entitled to a "nominal amount of alimony." Commencing with the sale or buyout of the marital home, the court ordered plaintiff to pay defendant alimony of $400 per month until she retired. Regardless of plaintiff's retirement, the court ordered alimony payable at least until April 28, 2026, when defendant turned sixty-five and qualified for Medicare. It ruled "alimony is going to be terminated effective the day of her retirement, as long as that occurs subsequent to May 1[], 2026."

## II.

"[F]indings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). This court "do[es] not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." M.G. v. S.M., 457 N.J. Super. 286, 293 (App. Div. 2018) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)). This is because the Family Part has "special jurisdiction and expertise in family matters," which often requires the exercise of reasoned discretion. Cesare, 154 N.J. at 413. If this court concludes there is satisfactory evidentiary support for the trial court's findings, "its task is complete and it should not disturb the result." Beck v. Beck, 86 N.J. 480, 496 (1981) (quoting State v. Johnson, 42 N.J. 146, 161-62 (1964)).

15

"Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is because the trial court "hears the case, sees and observes the witnesses, [and] hears them testify," affording them "a better perspective than a reviewing court in evaluating the veracity of witnesses." Id. at 412 (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)) (internal quotation marks omitted).

This court does not "accord the same deference to a trial [court's] legal determinations. Rather, all legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citation omitted) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)). "[L]egal conclusions, and the application of those conclusions to the facts, are subject to our plenary review." Reese, 430 N.J. Super. at 568.

Alimony awards are reviewed for an abuse of discretion. S.W. v. G.M., 462 N.J. Super. 522, 530 (App. Div. 2020). The Family Part also has broad discretion to allocate assets in equitable distribution. Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012). The breadth of this discretion also includes the allocation of debt. See Monte v. Monte, 212 N.J. Super. 557, 566-67 (App. Div.

16

1986). Income imputation decisions are also discretionary. <u>Storey v. Storey</u>, 373 N.J. Super. 464, 474 (App. Div. 2004).

## A.

Defendant asserts the equitable distribution of the pensions was an abuse of discretion. The parties had agreed to QDRO[1] the pensions and were ordered to retain an actuary to prepare the QDROs. However, he contends the court did not give them time to retain the actuary. Defendant claims when trial commenced, the only issue left to be addressed was alimony, yet the court also addressed equitable distribution notwithstanding the parties agreement otherwise.

Defendant further contends the court ignored the law by refusing to apply the coverture fraction to determine how the pensions should be distributed. He claims the court violated the three-step process for equitable distribution articulated in <u>Rothman v. Rothman</u>, 65 N.J. 219, 232 (1974).

Defendant argues the trial court's reasoning for its decision on the pension issue was unsupported by the evidence. The court improperly focused on plaintiff's future financial needs rather than the current value of her assets and income. It speculated about when plaintiff would retire and her retirement

---

[1] Qualified Domestic Relations Order.

income without determining the actual amount of her income in retirement. Defendant contends the evidence shows plaintiff would have more than enough income from her pension and Social Security to meet her needs and the martial lifestyle thereby contradicting the court's analysis of her cash flow.

Defendant further asserts the court did not consider N.J.S.A. 2A:34-23.1(f), the economic circumstances of the parties at the time the division of property became effective, in its decision. If the court had done so, it would have found plaintiff earns $180,000 a year, meaning her income is around $12,000 a month, or $6,000 more than the marital lifestyle. On the other hand, defendant earns only $72,000 a year, which equates to around $5,400 per month, and is $700 short of the $6,000 marital lifestyle. Defendant also claims the court erroneously imputed income to him and ignored that it would require him to rejoin the workforce after seven years of retirement.

Defendant argues the court failed to properly apply the equitable distribution factors set forth in N.J.S.A. 2A:34-23.1, did not make detailed findings of fact, and ignored and misrepresented the evidence. Regarding factor (b), he asserts the court failed to make specific findings about his health conditions or how those conditions would impact his future employability.

18

As to factor (c), defendant asserts the court erred in relying only on the fact plaintiff had a higher income than him in determining she contributed more financially during the marriage. The court did not account for the fact much of plaintiff's income went to her numerous debts and that she struggled to pay her bills, which evidenced she did not contribute a disproportionate amount to the marital finances.

Defendant contends the court failed to make findings of facts sufficient to support its analysis of factor (d). He argues the court's finding plaintiff contributed more financially to the parties' lifestyle is unsupported by the evidence, which showed the parties split expenses equally.

As to factor (f), defendant maintains the court should not have considered the parties' hypothetical financial circumstances three to five years in the future, and instead, it should have considered their financial status as of the date of the complaint. He asserts the court's findings under factor (g) contradicted its alimony analysis and findings because it acknowledged it would not be fair to require defendant to recreate himself, acquire new training, and reenter the workforce, as he was already retired and of an older age.

19

B.

Defendant insists we must not defer to the trial court's alimony determination because its findings were unsupported by the record. See State v. Brown, 118 N.J. 595, 604 (1990). He argues it did not make specific findings on the parties' health or their standard of living under N.J.S.A. 2A:34-23(b)(3) and (4). Defendant asserts the court did not make the necessary findings under N.J.S.A. 2A:34-23(b)(9) and merely proclaimed plaintiff financially contributed more to the marriage than he because she earned more than him.

Defendant further contends the parties established and maintained a lifestyle in retirement that did not anticipate defendant's return to the workforce. He maintains, considering the length of time he was absent from the workforce, his health issues, his limited technical skills, and plaintiff's clear ability to financially support him, any finding by the court indicating defendant could rejoin the workforce and imputing an income to him was reversible error and contrary to the purpose of the alimony statute.

Defendant urges us to remand to a different trial court because the court was prejudiced against him throughout the trial. He also asks us to invoke original jurisdiction under Rule 2:10-5 to determine the pension issue and QDRO the retirement assets.

A-0139-24

C.

Alimony and equitable distribution are interrelated. See N.J.S.A. 2A:34-23(b)(10) (requiring the court to consider the equitable distribution awarded and any direct or indirect payouts on equitable distribution when determining the type and amount of alimony); Conforti v. Guliadis, 128 N.J. 318, 324 (1992) (noting the intimate relationship of equitable distribution and support).

Our review of equitable distribution determinations is narrow. Valentino v. Valentino, 309 N.J. Super. 334, 339 (App. Div. 1998). We decide only whether the trial court "mistakenly exercised its broad authority to divide the parties' property and whether the result was 'reached by the trial judge on the evidence, or whether it is clearly unfair or unjustly distorted by a misconception of law or findings of fact that are contrary to the evidence.'" Ibid. (quoting Wadlow v. Wadlow, 200 N.J. Super. 372, 382 (App. Div. 1985)). "A sharp departure from reasonableness must be demonstrated before our intercession can be expected." Wadlow, 200 N.J. Super. at 382 (quoting Perkins v. Perkins, 159 N.J. Super. 243, 248 (App. Div. 1978)).

"[T]he goal of equitable distribution . . . is to effect a fair division of marital assets." Steneken v. Steneken, 183 N.J. 290, 299 (2005) (omission in original) (quoting Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div.

A-0139-24

2004)).  The trial court must identify the assets subject to equitable distribution, value the assets as of the date of the complaint, and determine how the assets should be distributed between the parties.  Rothman, 65 N.J. at 232.  Pursuant to N.J.S.A. 2A:34-23.1, the Legislature has provided sixteen factors the trial court must utilize in making an equitable distribution.

N.J.S.A. 2A:34-23.1 "reflects a public policy that is 'at least in part an acknowledgment that marriage is a shared enterprise, a joint undertaking, that in many ways . . . is akin to a partnership.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 284 (2016) (quoting Smith v. Smith, 72 N.J. 350, 361 (1977)) (additional internal quotation marks omitted).  The statute "advance[s] the policy of promoting equity and fair dealing between divorcing spouses."  Barr v. Barr, 418 N.J. Super. 18, 45 (App. Div. 2011).  "This requires evaluation of unique facts attributed to each asset."  Slutsky v. Slutsky, 451 N.J. Super. 332, 358 (App. Div. 2017).

Equitable distribution does not mean an equal distribution.  See Rothman, 65 N.J. at 232 n.6.  "N.J.S.A. 2A:34-23.1[] requires an equitable distribution be 'designed to advance the policy of promoting equity and fair dealing between divorcing spouses.'" M.G., 457 N.J. Super. at 295 (quoting Barr, 418 N.J. Super. at 45).  "This policy is best implemented by evaluating the facts and evidence

associated with each asset." Ibid. An appellate court's review is constrained to determining whether the Family Part's decision was based on sufficient, credible evidence in the record, and if it considered the controlling legal principles. See id. at 294.

The purpose of an alimony award is to "assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). "The standard of living during the marriage is the way the couple actually lived," taking into consideration whether parties "resorted to borrowing . . . or if they limited themselves to their earned income." Hughes v. Hughes, 311 N.J. Super. 15, 34 (App. Div. 1998).

Alimony is a right arising out of the marital relationship to maintain a lifestyle in accordance with "the economic standard established during the marriage as far as economic circumstances will allow." Aronson v. Aronson, 245 N.J. Super. 354, 364 (App. Div. 1991); see also Crews, 164 N.J. at 26-27 (explaining a court must consider the parties' need for new residences and increased expenses associated with both parties maintaining a standard of living "reasonably comparable" to their marital standard of living). As such, an award

23

of alimony is not intended as a reward, punishment, or windfall for the receiving party. Aronson, 245 N.J. at 364.

The marital lifestyle is important and is the measure used to establish alimony. See S.W., 462 N.J. Super. at 532-33. The court must consider how the parties actually lived during the marriage, calculate the money associated with their lifestyle, and apportion money to the supported spouse in accordance with those lifestyle figures. See id. at 532; Weishaus v. Weishaus, 360 N.J. Super. 281, 290-91 (App. Div. 2003) ("[T]he trial court [should consider] . . . the marital residence, vacation home[s], cars owned or leased, typical travel and vacations each year, schools, special lessons, and camps for [the] children, entertainment . . . , household help, and other personal services."), aff'd in part, rev'd in part, 180 N.J. 131 (2004).

Notably, a lifestyle determination is not the end of inquiry. Crews established after the court makes a finding on the parties' marital standard of living, it "should review the adequacy and reasonableness of the support award against this finding." 164 N.J. at 26. The court must always consider what is equitable. Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004). Therefore, an alimony award is not solely based on a lifestyle finding, as there are other considerations. See ibid.

Having considered the record under our standard of review and guided by the above principles, with one exception, we affirm the trial court's rulings substantially for the reasons expressed in its comprehensive and cogent opinion. We add the following comments.

The court did not abuse its discretion in deciding equitable distribution of the pensions because the record shows the parties had not resolved that issue through settlement. Given the parties' pensions were in pay status at the time of trial, the trial court appropriately considered the cash flow generated from them without utilizing a coverture formula because the court also had to decide the interrelated alimony issue in light of the unique economic circumstances of the parties' marriage where they did not pool income or assets.

The alimony calculation was sound, and we reject defendant's arguments to the contrary as without merit. R. 2:11-3(e)(1)(E).

However, we part company with the trial court insofar as its order allowed for the termination of alimony upon plaintiff's retirement. Although defendant did not raise this issue on appeal, it is subject to our de novo review because it is a question of law.

To recapitulate, the court stated plaintiff's alimony obligation would "automatically terminate" as early as May 1, 2026, if she elects to retire that day.

25

It imposed an obligation on plaintiff to notify defendant thirty days before she anticipates retiring. Plaintiff's counsel then sought clarification and asked the court, "just in terms of the alimony, just so I am clear, [plaintiff] cannot file an application to terminate alimony prior to May 1[ ], 2026. If she continues working beyond [that date] that application may be denied[?]" The court responded, "[c]orrect." However, it then proceeded to state plaintiff could move to terminate alimony if she had a medical issue and noted "[a]nything after May 1[ ], 2026, she just needs to notify [defendant]. She doesn't have to file an application [and] alimony [would] be terminated effective the day of her retirement," provided it occurs after May 1, 2026.

Alimony does not automatically terminate upon an obligor's retirement or early retirement. Indeed, N.J.S.A. 2A:34-23(j)(1) merely creates a rebuttable presumption for termination and requires the trial court to make a written finding whether the presumption has been overcome. In the context of an early retirement, N.J.S.A. 2A:34-23(j)(2) requires the obligor to file an application showing the prospective or actual retirement is reasonable and made in good faith. The court is then obligated to make the necessary findings. Ibid. At oral argument before us, plaintiff's counsel conceded plaintiff would be obligated to file a motion to terminate alimony upon retirement under N.J.S.A. 2A:34-23(j).

26

Accordingly, we remand for the court to enter an amended order requiring plaintiff to move to terminate alimony at retirement.

## III.

Finally, defendant's claims of bias were never raised before the trial court. Regardless, they are unsupported by the record and lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). The same is true of defendant's remaining arguments that we have not addressed in this opinion. Ibid.

Affirmed in part and reversed and remanded in part for the entry of an amended order consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division