**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0513-18T2

VICTORIA GOETHALS,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

JEFFREY J. GOETHALS,

    Defendant-Appellant/
    Cross-Respondent.

_____

> Argued September 18, 2019 – Decided January 7, 2020
>
> Before Judges Whipple, Gooden Brown and Mawla.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-0109-15.
>
> Joseph M. Freda, III, argued the cause for appellant/cross-respondent (Wilentz Goldman & Spitzer, and Gomperts Penza McDermott & Von Ellen, LLC, attorneys; Marisa Lepore Hovanec and Joseph M. Freda, III, of counsel and on the briefs).
>
> Paul H. Townsend argued the cause for respondent/cross-appellant (Townsend Tomaio &

Newmark LLC, attorneys; Paul H. Townsend, of counsel and on the brief; Jessica S. Swenson, Kevin Wei-Kwan Ku, and Jennifer M. Cornelius, on the briefs).

PER CURIAM

In this post-judgment matrimonial matter, defendant ex-husband moved to modify his alimony obligation based on plaintiff ex-wife's purported cohabitation and salary increase. Plaintiff cross-moved for counsel fees and an increase in child support based on defendant's alleged significant salary increase since the divorce. In a September 14, 2018 Family Part order, the judge denied both motions. Defendant appeals and plaintiff cross-appeals, each arguing the judge erred in determining each failed to establish a prima facie case of changed circumstances. Plaintiff also argues the judge erred in denying her counsel fees. We affirm the denial of counsel fees, but reverse in all other respects.

I.

We present an expansive recitation of the procedural and factual background to lend context to the issues subject to these appeals. The parties divorced in 2016 after a fifteen-year marriage that produced two sons, J.G.,[1] born April 2004, and N.G., born May 2007. The Marital Settlement Agreement

---

[1] We use initials to protect privacy.

(MSA) incorporated into the Final Judgment of Divorce (FJOD) required defendant to pay child support in the amount of $650 per month "[b]ased on an equal shared custody arrangement, the incomes reflected on the child support guidelines [guidelines]" and "the alimony obligation." The guidelines reflected total annual income of $789,048 for defendant and $157,976 for plaintiff. As to the alimony obligation, "[b]ased on the length of the parties' marriage," defendant's "base income of $439,000," plaintiff's base "income of $142,533," plaintiff's "needs," and "consideration of other statutory factors," defendant was obligated to pay plaintiff $103,992 per year or $8666 per month for six years, commencing upon the entry of the FJOD.

The MSA also provided:

> 32. As additional alimony, [defendant] shall directly provide [plaintiff] with [twenty-five percent] of his gross bonus received by him, . . . subject to a cap of $215,000. [Plaintiff's] gross annual bonus shall be subtracted from the amount of [defendant's] gross bonus or from $215,000, whichever is lesser and then multiplied by [twenty-five percent], to arrive at a fixed lump sum payment to [plaintiff] that shall fully satisfy this additional alimony award. . . .
>
> 33. Also as additional alimony, if [defendant] is paid any stock, stock options, [restricted stock units (RSUs)], or any form of additional compensation not otherwise subject to equitable distribution, including deferred compensation, other than his base salary and

bonus . . . , [plaintiff] shall receive [fifteen percent] of
same, subject to a cap of $16,320 net.

Pursuant to the MSA, "[t]he parties acknowledge[d] that the alimony terms . . . [would] not permit them to live at a standard of living reasonably comparable to that enjoyed by them during the marriage[,]" but agreed to "be bound by the terms" of the MSA "in consideration of all of the financial terms set forth in [the] [a]greement[.]" The MSA also provided for the premature termination of alimony upon either party's death or upon plaintiff's "remarriage." Additionally, the MSA provided that "[plaintiff's] cohabitation in a mutually supportive, intimate, personal relationship shall be considered a change of circumstances warranting a review of alimony." Further, the MSA specified that plaintiff had "an affirmative obligation to advise [defendant] of said cohabitation."

In the MSA, the parties acknowledged that they were represented by independent counsel, that they entered into the MSA "freely and voluntarily without coercion or duress[,]" and that they believed the agreement was "reasonable and fair." The parties also agreed to "pay their own counsel fees with regard to the preparation of the [MSA] and obtaining the [FJOD]." However, "if either party [brought] an application to enforce any term of th[e] [MSA], the party who failed to comply with th[e] [MSA] [would] be responsible

4

for paying any and all reasonable legal fees and costs[,] and other expenses awarded to the other party in successfully bringing an application to enforce th[e MSA]."

On May 16, 2017, plaintiff filed her third enforcement motion,[2] seeking an order finding defendant in violation of litigant's rights based upon defendant's failure to timely pay plaintiff her share of various stocks, stock options, bonuses, and income tax refunds in connection with the alimony and equitable distribution provisions of the MSA. Under the equitable distribution provisions of the MSA, plaintiff was entitled to specified portions of defendant's employee stock purchase plan shares and stock options that had vested. Additionally, any income tax refund for the parties' joint 2015 tax return was to "be allocated between the parties in proportion to his or her share of income in 2015." Plaintiff also sought counsel fees and costs associated with the enforcement motion.

Defendant opposed the motion, and cross-moved for other relief, including terminating, suspending, or modifying his alimony obligation based upon plaintiff's cohabitation with A.G. In responding to plaintiff's enforcement motion, defendant certified the court had previously addressed some of

---

[2] Plaintiff had partially prevailed in her prior motions.

A-0513-18T2

plaintiff's requests "in its most recent [o]rder," and other requests were submitted to an upcoming early settlement panel (ESP). Further, defendant certified plaintiff failed to cooperate with his earlier attempt "to settle up the bonus payments," and that he previously provided plaintiff checks totaling $135,790, representing her share of the vested stocks, as well as "all of the information . . . including detailed transaction information and associated tax[-]impact information" related to "the sale of the stock."

To support his cohabitation claim, defendant certified that "[p]laintiff and [A.G.] have been involved in an exclusive, enduring and committed relationship for the past three . . . years," which "began prior to" the finalization of their divorce and "has now resulted in . . . [p]laintiff and [A.G.] becoming engaged." In his certification, relying on Instagram and Facebook activity, personal observations, and a surveillance report prepared by a private investigation firm he retained, defendant asserted that "at a bare minimum[,]" plaintiff and A.G.:

> (1) are engaged; (2) spent consistent/regular overnights together from August 1, 2014 through the present; (3) moved together from . . . Birch Drive to . . . Berta Place in Basking Ridge; (4) blended their families together; (5) transported each other's children; (6) performed household chores together; (7) [ate] out together with their families; (8) attended parties, barbeques, and gatherings of friends/family; (9) performed crossfit training/competitions together; and (10) held

themselves out to the public, family, and friends as a couple.

Defendant provided screenshots of Instagram and Facebook comments, as well as photos and videos, showing, among other things, "[A.G.] and his [two] daughters . . . at . . . [p]laintiff's beach house and on her boat in the Barnegat Bay[,]" plaintiff donating $100 to a "fundraising page" on behalf of A.G.'s family member, and the couple's dogs spending time together. Additionally, the surveillance report revealed that A.G. spent approximately eighteen overnights at plaintiff's home between September 5, 2016 and April 1, 2017, and plaintiff and the parties' children stayed with A.G. at his Virginia property from April 21 through 23, 2017. The surveillance report also noted that A.G. was observed clearing snow from plaintiff's car, and "re-stack[ing] items in the recycling/garbage pile at the end of [plaintiff's] driveway." In addition, on October 15, 2016, "a POD[S] [c]ontainer, with [A.G.]'s belongings" was observed in "[p]laintiff's driveway," and "[o]n October 28, 2016, . . . a large moving truck" moved "[p]laintiff, [A.G.], and [the parties'] children . . . from . . . Birch Drive to . . . Berta Place."

In response, plaintiff acknowledged her engagement to A.G. as of April 1, 2017. However, plaintiff denied any intertwined finances, denied sharing household chores, denied making any enforceable promises to support each

7

other, and denied living with A.G. According to plaintiff, A.G. resided in his own home in Virginia and visited mainly on weekends. Plaintiff denied that A.G. moved with her to Berta Place, and denied that A.G.'s belongings were ever in the PODS container, which she obtained to move her belongings to Berta Place. Plaintiff denied being in a relationship akin to the supportive, intimate, and personal or marriage-like relationship that would warrant review of defendant's alimony obligation, and refuted defendant's contention that his social media exhibits proved otherwise.

In an August 1, 2017 order, the judge denied the parties' motions. As to plaintiff's enforcement motion, the judge ordered the parties to "agree on a forensic accountant to determine whether defendant owe[d] plaintiff additional money" in relation to the stock payment dispute. Regarding the bonus payments, the judge ordered the parties "to divulge to each other their 2016 additional compensation" as required under the MSA, and to make any outstanding payment "within [thirty] days of their respective receipts." As to counsel fees, the judge denied plaintiff's request pursuant to the MSA because her "motion was not successful." However, the judge granted plaintiff "leave to file" for counsel fees "regarding the stock payment issue only[,]" if the forensic

accountant's "report leads the court to [conclude] that defendant breached the MSA's provision regarding stock payment[.]"[3]

Turning to defendant's cohabitation claim, applying governing case law and the applicable statutory factors contained in N.J.S.A. 2A:34-23(n), the judge concluded "[d]efendant has fallen short . . . in making a prima facie case of cohabitation to shift the burden of proof to plaintiff." The judge explained that while A.G. and plaintiff were "engaged, plaintiff's relationship with [A.G.] is the romantic relationship characterized by regular meetings, participation in mutually appreciated activities, and some overnight stays," all of which were insufficient to establish cohabitation "considering the absence of economic impact." Specifically, the judge found defendant failed to produce any evidence of "intertwined finances[,] such as joint bank accounts and other joint holdings or liabilities," and failed to produce any evidence of "joint responsibility for living expenses[.]" The judge noted that "[e]ating out, vacationing, and visits to plaintiff's shore house do not suggest that plaintiff or [A.G.] are paying each other's living expenses."

---

[3] Plaintiff withdrew her request for her proportionate share of the joint income tax refund and reimbursement for the amounts defendant previously charged against plaintiff's share of equitable distribution payments.

Additionally, the judge found no evidence of "sharing household chores," or caring "for each other's children." The judge also rejected defendant's claim that "[twenty-eight] family Facebook photographs over the course of about two years which either plaintiff or [A.G.] liked or commented on" constituted "recognition of the relationship in the couple's social and family circle," or evidence "of a relationship tantamount to marriage." According to the judge, instead, "[t]his [was] evidence of casual contact between friends on the [i]nternet; not two families effectively merging by virtue of the relationship between a couple." The judge pointed out that "[e]ven if defendant had better evidence, recognition of the couple would not be dispositive of a prima facie case of cohabitation."

The judge continued:

> As for living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship, defendant's photographs of moving trucks and POD[S] containers confirm only one thing – that plaintiff moved and [A.G.] helped the movers. There is no evidence [A.G.'s] belonging[s] were inside the POD[S]. There is no evidence that [A.G] moved to New Jersey whatsoever, let alone back in October 2016, the time of the POD[S's] invoice and purported move. . . . All of the activity reported by the private investigator is nothing short of sporadic. The pattern of the time periods in the report reflect temporary visiting. The private investigator could not "string together" any

10

> significant length of time suggesting anything more than regular visits and overnight stays. Same is said for the defendant's own photographs offered as evidence . . . . Defendant's evidence certainly suggests an intimate and enjoyable relationship, albeit one mutually supportive emotionally, not economically. Intimacy does not pay the bills or maintain the standard of living memorialized in a [MSA].

On August 22, 2017, defendant moved for reconsideration, arguing that under the MSA, there was no requirement that there be economic impact or intertwined finances when determining cohabitation. Defendant stressed that based on the court's own findings, he made the requisite showing of changed circumstances as defined by the MSA. Plaintiff opposed the motion and cross-moved for an order finding defendant in violation of litigant's rights for failing to comply with an earlier court order directing defendant to reimburse plaintiff for real estate taxes, failing to cooperate with the forensic accountant retained pursuant to the August 1, 2017 order, and failing to resolve the outstanding bonus payment dispute. Plaintiff also sought counsel fees in connection with her motion. In a December 19, 2017 order, the judge denied defendant's motion. As to plaintiff's enforcement motion, the judge ordered defendant to reimburse plaintiff the real estate taxes addressed in the earlier court order, and ordered the parties to comply with the court ordered forensic accountant to resolve the

remaining issues.[4] The judge also determined that in the absence of "bad faith" by either party, "neither party [was] entitled to [c]ounsel fees."

On July 27, 2018, defendant filed another motion to review his alimony obligation, asserting changed circumstances based upon "[p]laintiff's cohabitation and/or [p]laintiff's substantial increase in income" from the time the MSA was entered.[5] In a supporting certification, defendant reiterated that "the court erred when it determined that intertwined finances were necessary" to establish cohabitation where the parties' MSA only required "a 'mutually supportive', 'intimate' and 'personal relationship[,]'" which defendant showed "[b]ased on the court's own findings[.]" Defendant added that plaintiff and A.G. "continue[d] to spend significant time" together "on a regular basis," and "function[ed] effectively as a blended family unit," sharing "a family [i]Cloud

---

[4] The judge determined that the stock payment dispute was moot based on defendant's concession and plaintiff's withdrawal of her request.

[5] Defendant had attempted to appeal the prior adverse cohabitation ruling, but withdrew his appeal because the outstanding forensic accountant's report precluded a determination of finality. Appeals as of right are limited to final judgment. See R. 2:2-3. "To be considered a final judgment appealable as of right, the order must generally dispose of all issues as to all parties." CPC Int'l, Inc. v. Hartford Accident & Indem. Co., 316 N.J. Super. 351, 365 (App. Div. 1998).

account where they chronicle[d] important events with themselves and their children."

Once again, defendant provided photos of the families "spend[ing] holidays, vacations and the summer together," including "Christmas [c]ard photographs," "their new family dog," and "cooking" photos "in [p]laintiff's kitchen." Defendant certified that A.G. "assist[ed] with parental responsibility for [the parties'] children," as evidenced by him "dropping [them] off" for parenting time with defendant, and by the parties' "son regularly refer[ring] to [A.G.] as his 'step-dad'." To support the latter allegation, defendant provided his girlfriend's affidavit, certifying that the parties' children often called A.G. their stepfather, and that A.G.'s children had a room at plaintiff's shore home, which they decorated.

While stressing that intertwined finances were "absolutely unnecessary" to establish cohabitation, defendant noted it was "readily apparent" from plaintiff and A.G. "spend[ing] time together at [p]laintiff's residence, her shore house, on vacations, and holidays" that "[b]oth parties [were] certainly economically benefit[t]ing from same." Additionally, defendant provided a spending summary from the parties' "pre-divorce joint [bank] account," which

defendant asserted was used by plaintiff to make purchases for A.G.'s Virginia home and to pay for A.G.'s travel expenses "while they vacationed together."

To support his claim of changed circumstances based upon plaintiff's change in income, defendant certified that "[p]laintiff's total income increased to $181,870.31," representing "an almost [thirty percent] increase" since "the time of [their] divorce." Further, according to defendant, plaintiff was "promoted as of March 2018 to the Director of Sales Compensation and Health Systems Analytics[,]" which defendant "surmise[d]" would result in an even greater increase in plaintiff's income and "an even greater ability to meet the marital standard of living." In compliance with court rules, see R. 5:5-4(a), defendant submitted his prior Case Information Statement (CIS) and an updated CIS, dated July 27, 2018, showing that defendant earned an annual salary of $461,600, plus $396,630 in bonuses, and had a current lifestyle of $33,435 per month.

Plaintiff opposed defendant's motion and cross-moved for an order "[r]ecalculating [c]hild [s]upport based on the substantial change of circumstances in [d]efendant's significantly increased income;" "[f]inding [d]efendant in contempt of the [c]ourt's [August 1 and December 19, 2017] [o]rders . . . for failure to cooperate with the [c]ourt[] [appointed forensic

accountant;]" "[f]or counsel fees and costs related to th[e] application;" and other relief not pertinent to these appeals. In support, plaintiff certified there was "no merit to [d]efendant's third application seeking to terminate alimony based on cohabitation" when the court had previously determined "that all [d]efendant can show is that [she] was dating and . . . [was] now engaged to someone who live[d] far away and visit[ed] from time to time." Plaintiff reiterated that she and A.G. "do not share expenses, chores[,] or any other factors the [c]ourt considers." Plaintiff denied "own[ing] any part of" A.G.'s Virginia home or "purchas[ing]" any furniture for his home. Plaintiff also denied that the parties' children "call[ed] [A.G.] their step-father" and denied "hav[ing] 'blended' [their] families," asserting that the parties' children had only met A.G.'s children on "a few occasions."

Regarding their income, plaintiff acknowledged "[she] did receive a raise and promotion" in 2017, but asserted it was her "base salary and bonus" combined that totaled $181,000, whereas the MSA "specifically used only . . . base salaries and not bonus income for purposes of determining alimony." Plaintiff noted that "[a]limony related to bonus[es] and 'other' income was dealt with separately" in the MSA. Plaintiff further certified that "even with [her] recent [eight percent] raise[,]" she was "still living below the marital lifestyle

and [her] earnings [were] not sufficient to cover [her] expenses without alimony." In contrast, relying on defendant's updated CIS, plaintiff pointed out that defendant's "expected annual income" for 2018 was "$2.8 million[,]" representing "a 350 [percent] increase from his earnings at the time of [the] divorce." Plaintiff asserted further that since the divorce, "in addition to more than tripling his earnings[,]" defendant was promoted from "Group Vice President of Business Information" to "Senior Vice President of Merchant Support."

According to plaintiff, because "[d]efendant's lifestyle has also grown exponentially" to "well more than [the parties'] marital lifestyle and significantly more than [her] own current lifestyle[,]" "any change of circumstances caused by [her] . . . raise [was] far out[-]shadowed by his." Additionally, to support her request for an increase in child support to $1204 per month, plaintiff submitted an updated guidelines calculation, using current income figures for both parties. Plaintiff also sought counsel fees, asserting defendant had "intentionally [misled] the [c]ourt with frivolous and repetitive application[s] while refusing to comply with the terms of [the] MSA and [c]ourt [o]rders."

In reply, defendant denied earning $2.8 million, denied being promoted since they finalized the divorce, and certified "[his] income has remained

16

virtually unchanged since [their] divorce[.]" Defendant averred his annual base salary remained $461,600, and he received a gross bonus of $396,630, "of which [p]laintiff will receive a share as additional alimony upon finalization of the accountant's figures[.]"[6] Further, to reinforce his assertion that plaintiff and A.G. "are recognized as a couple in the [family] and social circles," defendant provided a surveillance report and photos, documenting that A.G. and his extended family attended an eighth grade graduation party for the parties' son at plaintiff's shore home on July 28, 2018.

On September 14, 2018, a different judge denied the portions of the motions pertinent to these cross appeals.[7] In an accompanying statement of reasons, addressing the cohabitation issue, which the judge described as defendant's "third bite at the apple," the judge refused to "disturb a well-reasoned decision that has been decided twice before," with no "change" of circumstances "since the time of those decisions[.]" Relying on the statutory factors enumerated in N.J.S.A. 2A:34-23(n), the judge explained:

---

[6] Contrary to plaintiff's claim, defendant also certified that he had provided all required documentation to the forensic accountant, and that his counsel was "in constant contact" with the accountant to expedite the final report.

[7] Unrelated to the issues raised in these appeals, the judge granted plaintiff's requests for the appointment of a parent coordinator, and the use of the My Family Wizard program for communication.

While [p]laintiff is now engaged, [d]efendant has only been able to prove that the fiancé has overnight visits on multiple occasions, especially when the [p]laintiff is hosting a party. The fact that the [p]laintiff openly shows her family and friends that she is in a relationship is not a deciding factor. Neither is the fact that the couple's children have met and spent time together. Even more significantly, [p]laintiff's fiancé lives in Virginia and the couple does not have intertwined finances.

Rejecting defendant's contention that he made the requisite showing of cohabitation as defined in their MSA, the judge disagreed that "[p]laintiff's relationship [with A.G. was] truly . . . one that [was] 'mutually supportive,' as stated in the parties' definition of cohabitation." In that regard, the judge agreed with the prior judge that while "plaintiff and [A.G.'s] engagement [was] certain[l]y relevant," it was "not dispositive considering the absence of economic support[,]" and the fact that the couple "live[d] and maintain[ed] homes in two different states[.]"

Addressing the parties' respective salary increases since the time of the divorce to establish the requisite changed circumstances, as to defendant's contention, the judge acknowledged the conflicting certifications, but determined that "[e]ven assuming the facts alleged by the [d]efendant," the "percentage of permanent increase" between the parties was "not significant" "under the circumstances" to warrant "a recalculation" of alimony. Relying on

18

Glass v. Glass, 366 N.J. Super. 357 (App. Div. 2004), the judge explained that "a supported spouse's increase in income does not, in and of itself, constitute a substantial change in circumstances warranting a reduction or termination of support, even when such an increase enables the supported spouse to maintain the standard of living enjoyed during the marriage, without the need for support."

Turning to plaintiff's request to recalculate child support based on defendant's "significantly" increased income, the judge found that, based on defendant's statements, "his expected earnings will be $1.4 million, including stock gains subject to additional distributions[,]" rather than $2.8 million as alleged by plaintiff. As to plaintiff, the judge determined "[p]laintiff's income has increased by [thirteen percent.]" Despite finding "that both parties['] salaries have increased, as well as the parties['] stock gains and required distributions pursuant to the MSA[,]" the judge found no "change in circumstances to warrant a modification of child support."

Finally, the judge denied plaintiff's request to hold "[d]efendant in contempt of court," ordered "[d]efendant to comply with all outstanding [o]rders as well as any requirements left uncompleted from the MSA[,]" and denied both parties' requests "for counsel fees." Considering Rule 4:42-9 as well as the Rule

5:3-5(c) factors, the judge relied on the "ongoing issues between the parties," "their inability to communicate," as well as the fact that "[b]oth parties are financially sound, and able to pay their respective fees" to support his decision denying counsel fees. These appeals followed.

## II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[R]ecognizing the special expertise of judges hearing matters in the Family Part, we accept the trial judge's conclusion when evidentially supported." Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (citing Cesare, 154 N.J. at 412). We will only intervene "to 'ensure that there is not a denial of justice'" when the trial court's conclusions are "'clearly mistaken' or 'wide of the mark[,]'" ibid. (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)), "or when we determine the court has palpably abused its discretion." Id. at 47 (citing Cesare, 154 N.J. at 412). "However, when reviewing legal conclusions, our obligation is different; '[t]o the extent that the trial court's decision constitutes a legal determination, we review it de novo.'" Landers v. Landers, 444 N.J. Super. 315, 319 (App. Div. 2016) (alteration in original) (quoting D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)).

Guided by these standards, we turn to the parties' specific arguments. Defendant argues that "[n]otwithstanding the abundance of proofs demonstrating a strong likelihood that [p]laintiff and [A.G.] were engaged in the type of mutually supportive, intimate personal relationship contemplated by the parties as justifying a review of alimony in their MSA, the [t]rial [c]ourt denied [his] request for any relief on the issue." Defendant asserts the court's "determination that [d]efendant had not met his prima facie burden of demonstrating cohabitation went against the weight of the evidence[,]" and "[a]s such, . . . must be reversed, and the matter remanded for discovery and a plenary hearing." We agree.

It is well established that cohabitation by a dependent ex-spouse constitutes a changed circumstance that could justify a modification of the supporting ex-spouse's alimony obligation. Gayet v. Gayet, 92 N.J. 149, 154-55 (1983). In Landau v. Landau, ___ N.J. Super. ___ (App. Div. Sep. 12, 2019), we recently held that "the changed circumstances standard of Lepis v. Lepis, 83 N.J. 139, 157 (1980), continues to apply to a motion to suspend or terminate alimony based on cohabitation following the 2014 amendments to the alimony statute, N.J.S.A. 2A:34-23(n)." Landau, slip op. at 1-2. Those amendments defined cohabitation as "involv[ing] a mutually supportive, intimate personal

21

relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household." N.J.S.A. 2A:34-23(n). Under the statute, "[a] court may not find an absence of cohabitation solely on grounds that the couple does not live together on a full-time basis." Ibid.

Instead, courts "shall consider" the following factors "[w]hen assessing whether cohabitation is occurring[:]"

> (1) Intertwined finances such as joint bank accounts and other joint holdings or liabilities;
>
> (2) Sharing or joint responsibility for living expenses;
>
> (3) Recognition of the relationship in the couple's social and family circle;
>
> (4) Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;
>
> (5) Sharing household chores;
>
> (6) Whether the recipient of alimony has received an enforceable promise of support from another person . . . ; and
>
> (7) All other relevant evidence.
>
> [Ibid. ]

In Landau, after carefully reviewing the amendments, "we [saw] no indication the Legislature evinced any intention to alter the Lepis changed circumstances paradigm when it defined cohabitation and enumerated the factors a court is to consider in determining 'whether cohabitation is occurring' . . . ." Landau, slip op. at 13 (quoting N.J.S.A. 2A:34-23(n)). We determined the party seeking modification still bears the burden of establishing "[a] prima facie showing of changed circumstances . . . before a court will order discovery of an ex-spouse's financial status[.]" Id. at 17 (alteration in original) (quoting Lepis, 83 N.J. at 157).

In Gayet, the Court held that cohabitation of the dependent ex-spouse constitutes a change of circumstances to justify the reduction or termination of alimony by the supporting ex-spouse only if the economic benefit inuring to either cohabitor is sufficiently material to justify relief. 92 N.J. at 154-55. "Under this economic needs test, the reduction in alimony is granted in proportion to the contribution of the cohabitor to the dependent spouse's needs." Konzelman v. Konzelman, 158 N.J. 185, 196 (1999) (citing Gayet, 92 N.J. at 154-55).

However, in Konzelman, after recognizing the enforceability of cohabitation provisions in property settlement agreements, the Court held that

23                                                      A-0513-18T2

"an agreement between the parties to allow cohabitation to terminate alimony obligations can be a valid basis for discontinuing alimony, without regard to the economic consequences of that relationship" provided that both parties have agreed to this contingency. Id. at 196. According to the Court,

> a specific consensual agreement between the parties to terminate or reduce alimony based on a predetermined change of circumstances does not require an inquiry into the financial circumstances or economic status of the dependent spouse so long as the provision itself is fair. Thus, where the parties have agreed that cohabitation will constitute a material changed circumstance, and that [the] agreement has been judged fair and equitable, the court should defer to the arrangements undertaken by the parties.
>
> [Id. at 197.]

Here, the MSA specified "cohabitation in a mutually supportive, intimate, personal relationship shall be considered a change of circumstances warranting a review of alimony." Indeed, the prior judge's decision, upon which this judge relied, found defendant's evidence established "an intimate and enjoyable relationship, albeit one mutually supportive emotionally[.]" However, by dismissing the substantial evidence amassed by defendant, and requiring evidence of intertwined finances and the couple living together on a full-time basis to establish prima facie evidence of changed circumstances, the judge

24

misapprehended the express provision of the MSA and the factors enumerated in N.J.S.A. 2A:34-23(n).

Thus, we agree with defendant that the judge committed reversible error. Consistent with the procedure outlined in Lepis, the judge should have ordered discovery, and held a hearing to address the material facts that were in genuine dispute. 83 N.J. at 159-60. We therefore reverse and remand on this issue. Based on our decision, we will not address defendant's alternate contention that the judge misapplied Glass, 366 N.J. Super. at 361-62, in determining that "[p]laintiff's substantial increase in income was not a change in circumstances warranting a review of alimony." However, we do not limit the remand to the cohabitation issue and direct instead that "[a]ll relevant considerations should [be] addressed[.]" Id. at 376.

In her cross-appeal, plaintiff argues the judge erred in denying her motion for modification of child support based solely on the fact that both parties, rather than defendant alone, had increased earnings since the divorce. According to plaintiff, her "modest raise . . . only provide[d] further basis for the [c]ourt to recalculate child support in light of [d]efendant's considerable increase in earnings."

Like alimony, child support orders are subject to review and modification "from time to time," N.J.S.A. 2A:34-23, "on a showing of 'changed circumstances.'" Lepis, 83 N.J. at 146 (quoting Chalmers v. Chalmers, 65 N.J. 186, 192 (1974)). Child support may be revised when the party seeking modification satisfies the burden of showing a change of circumstances from those defined in an existing order. See N.J.S.A. 2A:34-23; Lepis, 83 N.J. at 157; Beck v. Beck, 239 N.J. Super. 183, 190 (App. Div. 1990). Significant changes in income or earning capacity of either parent may result in a finding of changed circumstances as "[c]hildren are entitled to have their 'needs' accord with the current standard of living of both parents, which may reflect an increase in parental good fortune." Zazzo v. Zazzo, 245 N.J. Super. 124, 130 (App. Div. 1990).

Applying this standard, we are satisfied plaintiff made the requisite showing based on the increased income and earning capacity of both parties. Further, given the significant disputed facts surrounding defendant's income and earning capacity, plaintiff has demonstrated her entitlement to reciprocal discovery to test defendant's representations regarding his earned income, earning ability, and discretionary bonuses. Indeed, the "complete financial information of both parents [is] necessary for any order of child support." Id. at

26

129. If necessary, a plenary hearing should be conducted to resolve any material facts in dispute. See Lepis, 83 N.J. at 159 (holding that a plenary hearing must be conducted on a motion to modify support when there are genuine issues of material fact that bear on a critical question).

In her cross-appeal, plaintiff also challenges the judge's denial of counsel fees. Plaintiff argues she was entitled to an award of counsel fees under the MSA because defendant "failed to comply with prior [c]ourt [o]rders as well as the[] MSA." Plaintiff also asserts counsel fees are appropriate because defendant acted "in the utmost bad faith" by "fil[ing] motion after motion without the required new, substantial[,] and credible evidence."

Rule 4:42-9(a)(1) authorizes the award of counsel fees in a family action. In making the determination, pursuant to Rule 5:3-5(c), the court should consider the following factors:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties . . . ; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

A-0513-18T2

See also N.J.S.A. 2A:34-23.

"The application of these factors and the ultimate decision to award counsel fees rests within the sound discretion of the trial judge." Gotlib v. Gotlib, 399 N.J. Super. 295, 314-15 (App. Div. 2008) (quoting Loro v. Colliano, 354 N.J. Super. 212, 227 (App. Div. 2002)). "We will disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).

Here, under the MSA, the parties agreed that the party who brought a successful enforcement motion for non-compliance with the MSA would be entitled to counsel fees from the non-compliant party. However, plaintiff did not prevail on her enforcement motion and does not challenge that determination in her cross-appeal. Thus, plaintiff was not entitled to counsel fees under the MSA provision. Additionally, the judge considered the financial circumstances of the parties, determined both parties were able to pay their respective fees, assessed the disputed issues and results obtained, and found no bad faith on the part of defendant. Therefore, in denying counsel fees, the judge considered the requisite factors.

We are satisfied the judge's decision reflects no clear abuse of discretion to warrant reversal. In so concluding, we acknowledge plaintiff's frustration and belief that "[d]efendant's actions are clearly retaliatory" and designed "to abuse [p]laintiff through the legal system." We also "recognize the potential for abuse of the judicial process and waste of personal and judicial resources implicit in the making of repeated 'incremental' motions, and we vigorously disapprove such a course of conduct." Beck, 239 N.J. Super. at 191. However, we also recognize that a litigant "should not . . . ordinarily be penalized by the deprivation of a remedy to which he would otherwise be entitled." Ibid.

In sum, we affirm the judge's denial of counsel fees, but reverse the judge's determination that both parties failed to establish a prima facie case of changed circumstances to justify discovery and, if necessary, a plenary hearing. Accordingly, we remand for the judge to permit the parties to engage in reciprocal discovery, and conduct a plenary hearing, if warranted. To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION